ALLEN RUBY (SBN 47109)
LAW OFFICES OF ALLEN RUBY
125 South Market Street #1001
San Jose, CA 95113
Telephone: (408) 998-8500 ext. 204
Facsimile: (408) 998-8503

CRISTINA C. ARGUEDAS (SBN 87787)
TED W. CASSMAN (SBN 98932)
MICHAEL W. ANDERSON (SBN 232525)
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 845-3000
Facsimile: (510) 845-3003

DENNIS P. RIORDAN (SBN 69320)
DONALD M. HORGAN (SBN 121547)
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472

Attorneys for Defendant
BARRY LAMAR BONDS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> BARRY LAMAR BONDS, ) <br> ) <br> Defendant. ) | Case No. CR 07 0732 SI |

**DEFENDANT'S RESPONSE TO UNITED STATES' SUPPLEMENTAL FILING RE: DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE**

**INTRODUCTION**

Both the Constitution and the Rules of Evidence express a general requirement that criminal convictions may not be obtained by second-hand evidence. *See* U.S. Const., amend. VI; Fed. R. Evid. 602, 802. But because the government anticipates that Greg Anderson will not testify favorably to its position, it seeks to rest much of its case on second hand evidence, either in the form of purported out of court statements of Anderson, or of other evidence the admissibility of which necessarily rests on those statements by Anderson.

The government's intended strategy triggered a several-month process to identify and resolve admissibility issues prior to trial. Both parties submitted extensive briefing, including a fifty-three page memorandum of law from the government urging the Court to admit Anderson's statements under multiple exclusions from, and exceptions to, the hearsay rule. After convening a hearing last Thursday, February 5th, the Court issued tentative rulings that certain test results and calendars could not be admitted unless Anderson took the stand to identify them as pertaining to Mr. Bonds and was subjected to cross-examination.

In its supplemental pleading (hereafter "G. Supp"), the government continues, in a scattershot fashion, to search for legal authority that will justify its attempt to obtain a conviction based on hearsay. Despite previously arguing for admission of its second hand evidence under FRE 801(d)(2)(E) — the subsection excluding coconspirator statements from the hearsay ban— the government claims to have belatedly discovered other provisions of the same rule that serve its purpose: 801(d)(2)(C), the speaking agent exclusion, or (d)(2)(D), the agent-servant exclusion. There is, however, no evidence that Anderson was Mr. Bond's "speaking agent," so the narrowly constructed (d)(2)(C) does not apply. And (d)(2)(D), although intended to broaden the common law exclusion for vicarious admissions, still does not reach independent contractors. Because the government has not shown, and could not show, that Mr. Anderson was an employee rather than an independent contractor, (d)(2)(D) does not apply either. The weaker contentions now raised by the government fare no better than its previous failed hearsay arguments.

1

**A. The Speaking Agent Exclusion From The Hearsay Ban**

Rule 801(d)(2)(C) codified a common law hearsay exclusion which was known as the "speaking agent" or "authorized statement" exclusion. *See* Mueller & Kirkpatrick, *Evidence* § 8.31 (3d ed. 2003). As the rule itself states, the exclusion only applies where the declarant is "authorized by the party to make a statement." *See Precision Piping v. Du Pont*, 951 F.2d 613, 619 (4th Cir. 1991); *FDIC v. Glickman*, 450 F.2d 416, 418 (9th Cir. 1971) ("Statements by an agent are admissible against the principal to prove the truth of the facts asserted therein, *only if he was authorized to make those statements.*") (emphasis in original).

The relevant authorization must be for the statement itself; authority to *act* on the party's behalf does not automatically carry authority to *speak*. This distinction, drawn from agency law,[1] was critical in applying the speaking agent exclusion at common law.

> [I]t is important to distinguish between authority to do an act and authority to talk about it. The mere fact that B has empowered A to do act X for him adds no whit of trustworthiness to A's narratives about X; nor does it furnish any grounds for depriving B of the usual protection against unexamined testimony.

Edmund M. Morgan, *Rationale of Vicarious Admissions*, 42 Harv. L. Rev. 461, 463 (1929).

> This formula made plain that the statements of an agent employed to give information (a so-called "speaking agent") could be received as the employer's admissions, and the authority to act, e.g., the authority of a chauffeur to drive a car, would not carry with it automatically the authority to make statements to others describing the duties performed.

*McCormick on Evidence* § 259 (6th ed. 2006). In other words, the exclusion does not apply to most employees, but rather applies only where there is true speaking authority of the sort given to attorneys and spokespersons. *See Hanson v. Waller*, 888 F.2d 806, 814 (9th Cir. 1989).

As a result, the speaking agent exclusion is very narrow. The government makes no showing, much less proves by a preponderance of the evidence,[2] that Anderson had speaking

---

[1] *See* Restatement (Second) of Agency § 288 ("[A]uthority to do an act or to conduct a transaction does not of itself include authority to make statements concerning the act or transaction . . . .").

[2] The government incorrectly asserts that existence of an agency relationship need only be proven by "substantial" evidence for purposes of applying the exclusion set forth in FRE

2

authority. It only argues that Mr. Bonds's grand jury testimony "confirms that the defendant authorized Anderson to take his urine specimens to Balco for testing." (G. Supp., at 3.) Even if that is true, it merely shows the authority to act, not the authority to speak. The government entirely misses the critical legal distinction that governs the application of subsection (d)(2)(C).

Indeed, it was the narrow scope of the "authorized statement" exclusion that led the Advisory Committee to adopt (d)(2)(D), the "agency or employment" provision, to supplement (d)(2)(C).[3] The Advisory Committee added (d)(2)(D) because it believed that the speaking agent exclusion was, by itself, extremely restricted. Fed. R. Evid. 801, Advisory Committee Note.

In the first line of its argument concerning (d)(2)(C), the government states: "Bonds testified in the grand jury that he had authorized Anderson, as his trainer, *i.e. his employee,* to take his blood and urine samples to Balco in order to get them tested." (G. Supp., at 2; emphasis added) Because its argument under (d)(2)(C) really rests on the assertion that Anderson gained his authorization as an employee of Bonds, the Anderson hearsay must pass muster under the (d)(2)(D) "agent-servant" provision if it is to gain admission at all.

**B.   The Agent-Servant Exclusion**

While the speaking agent exclusion of (d)(2)(C) is very narrow, the agent-servant exclusion of (d)(2)(D) is admittedly broader in scope. As described above, (d)(2)(D) was added to the Rules for the precise purpose of admitting a larger class of employee admissions than had

---

804(d)(2)(D). (G. Supp., at 2) *See Bourjaily v. United States*, 483 U.S. 171 (1987) (Proponent of a co-conspirator statement under FRE 804(d)(2)(E) must prove the underlying conditions by a preponderance of the evidence). In 1997, FRE 804(d)(2) was amended to apply *Bourjilay* to the preliminary factual issues of authorization and agency raised by subsections (d)(2)(C) and (D). See Advisory Committee Note, 1997 Amendments ("[t]he amendment extends the reasoning of *Bourjilay* to statements offered under subdivisions (C) and (D) of Rule 801(d)(2)."); see also *In re Napster Copyright Litigation*, 479 F.3d 1078, 1096 (9th Cir. 2007) ("And we know from *Bourjaily* that preliminary questions of fact under Rule 104(a) must be established by a preponderance of the evidence.")

[3] *See Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1565 (11th Cir. 1991) ("Rule 801(d)(2)(D) broadened the traditional view so that it is no longer necessary to show that an employee or agent declarant possesses 'speaking authority,' tested by the usual standards of agency law, before a statement can be admitted against the principal.").

3

been allowed at common law. Statements made by employees became admissible to prove tort liability under the doctrine of respondeat superior. Despite its broader scope, (d)(2)(D) does not apply here for the simple reason that Anderson indisputably was not an employee of Mr. Bonds.

The terms "agent" and "servant" in the Rule were borrowed from substantive law — more specifically, from the Restatement (Second) of Agency. *United States v. Wiedyk*, 71 F.3d 602, 605 (6th Cir. 1995); *Boren v. Sable*, 887 F.2d 1032, 1038 (10th Cir. 1989); *see also NLRB v. United Ins. Co.*, 390 U.S. 254, 256 (1968). The Restatement explicitly distinguished independent contractors from agents and servants (i.e., employees). *See* Restatement (Second) of Agency §§ 2(3), 200. Thus, it is a matter of hornbook law that "statements of a party's independent contractors typically do not come within Rule 801(d)(2)(D)." 5 *Weinstein's Federal Evidence* § 801.33[2][b]. The Ninth Circuit has explicitly held that (d)(2)(D) does not cover statements made by independent contractors. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1440 (9th Cir. 1990). So has every other circuit to consider the question.[4]

As the proponent of the evidence, the government must prove by a preponderance that Anderson was an employee rather than an independent contractor. *See American Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 333 (8th Cir. 1996); *Merrick*, 892 F.2d at 1440. Its argument on (d)(2)(D) *claims* that "Anderson, as Bonds's trainer, was functioning as Bonds's agent and *employee* when he delivered Bonds's the [sic] specimens to Balco." (G. Supp., at 5; emphasis added) But the government has not even attempted a showing of employment.

Since the government has chosen not to shoulder its burden, the issue is settled. But in any event, even if this Court were to proceed *sua sponte* to a determination of the issue, Anderson clearly was not Mr. Bonds' employee; in fact, the record supports the conclusion that he was not even an independent contractor. As Mr. Bonds testified before the grand jury, his

---

[4] *See, e.g., Crigger v. Fahnestock & Co.*, 443 F.3d 230, 238 (2d Cir. 2006); *Fraser v. Major League Soccer*, 284 F.3d 47, 65 (1st Cir. 2002); *Murrey v. United States*, 73 F.3d 1448, 1456 (7th Cir. 1996); *Lippay v. Christos*, 996 F.2d 1490, 1499 (3d Cir. 1993); *Sanford v. Johns-Manville Sales Corp.*, 923 F.2d 1142, 1149-1150 (5th Cir. 1991).

4

relationship with Anderson was that of a friend, not an employee. (GJ RT at 135)[5]. He considered the money he gave Anderson gifts, and did not deduct them on his taxes, as one would if he were paying an independent contractor for a business related expense. (*Id*., at 136).

The distinction between employee and contractor, which arises in several areas of law, is governed by a multi-factor test drawn from § 220 of the Restatement. *See NLRB v. Friendly Cab Co.,* 512 F.3d 1090, 1096-97 (9th Cir. 2008); *see also* IRS Publication 15-A, *Employer's Supplemental Tax Guide* 6-9 (Dec. 30, 2008). The factors include: whether the master exercises control over the details of the work, whether the workman makes his services available to others, whether the workman pays his own business expenses, whether the workman is employed in a distinct occupation, whether the master trains the workman, whether the master supplies the tools or instrumentalities of the work, the manner and method of payment, and so on.

Anderson worked in a distinct occupation; he provided services to many other customers (GJ RT at 62-63); he trained Bonds rather than being trained by him (*id.)*; Bonds did not supply his tools or supplies; Bonds did not pay him regular salary; and so on. Anderson was, at most, an independent contractor; at a minimum, the government has not made any showing to the contrary. Therefore, Anderson's statements are not admissible under Rule 801(d)(2)(D).

## CONCLUSION

The government's implicit theory of Rule 801(d)(2) is that *any* statement made by a friend or affiliate can be used against a party, but the vicarious admissions exclusions are far narrower than the government suggests. The (d)(2)(C) exclusion only applies to the common law category of speaking agents, and the (d)(2)(D) exclusion applies to employees, not to independent contractors. In the end, the government's belated attempt to justify the admission of un-confronted, second-hand evidence fares no better than its earlier attempt.

//
//
//

---

[5] The entire grand jury transcript is now before the Court, but for the Court's convenience defendant will supply the pages cited herein as Exhibit A.

Dated: February 13, 2009

Respectfully submitted,

LAW OFFICES OF ALLEN RUBY

ARGUEDAS, CASSMAN & HEADLEY, LLP

RAINS, LUCIA & WILKINSON, LLP

RIORDAN & HORGAN

By /s/ Dennis P. Riordan
    Dennis P. Riordan

By /s/ Donald M. Horgan
    Donald M. Horgan

Counsel for Defendant
Barry Lamar Bonds

# EXHIBIT A

# ORIGINAL

GRAND JURY

NORTHERN DISTRICT OF CALIFORNIA

GJ INVESTIGATION NO. 2002R01596        )

# CONFIDENTIAL

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TESTIMONY OF

BARRY BONDS

AT UNITED STATES DEPARTMENT OF JUSTICE

450 GOLDEN GATE AVENUE

SAN FRANCISCO, CALIFORNIA 94102

THURSDAY, DECEMBER 4, 2003; 1:23 P.M.


FOR THE GOVERNMENT:

KEVIN V. RYAN, UNITED STATES ATTORNEY

BY:  JEFF NEDROW, ASSISTANT UNITED STATES ATTORNEY

     ROSS NADEL, ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DEPARTMENT OF JUSTICE

450 GOLDEN GATE AVENUE

SAN FRANCISCO, CALIFORNIA 94102

1      A.    None.

2      Q.    None?

3      A.    None.

4      Q.    Did you ever talk to Armando Rios about working
5   with Mr. --

6      A.    Armando -- you got to understand, all these
7   guys, if they trained with Greg, they'd be training with
8   me, because Greg is with me every day.

9      Q.    Okay.

10     A.    So, no, I don't believe he trained with them.
11  Because he -- he's with me.

12     Q.    What about Benito Santiago?

13     A.    No way.  There's no way.  Benito ain't training
14  that hard.  There's no way.  I'm sorry.  I love him...

15  BY MR. NADEL:

16     Q.    You said that --

17     A.    I neither is Armando.

18  BY MR. NADEL:

19     Q.    You said that Mr. Anderson is with you every
20  day.

21           Does he go with you to spring training?

22     A.    For just the weekend.  He'll come in -- because
23  he has other clients at the gym, you know, that needs
24  training.  So, he'd come from, like, Friday to Sunday.
25  And so we'd just modified my training.  Because normally

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | I go, like, Monday, Tuesday, Wednesday off, Thursday,        |
| 2  | Friday. So, we modified to where I worked out when he        |
| 3  | got here to make sure I trained.                             |
| 4  | Q.   Was that pretty much the habit that during              |
| 5  | spring training he would come on weekend?                    |
| 6  | A.   Every other weekend.                                    |
| 7  | Q.   Every other weekend during spring training?             |
| 8  | A.   Yeah, for the past couple years, yeah.                  |
| 9  | BY MR. NEDROW:                                               |
| 10 | Q.   Okay. And actually I think you answered this,           |
| 11 | then, but let me go back and clarify this.                   |
| 12 | Did the Giants training staff have any                       |
| 13 | involvement in working with you with Mr. Anderson?           |
| 14 | A.   No way.                                                 |
| 15 | Q.   Okay. And back --                                       |
| 16 | A.   We don't trust the ball team. We don't trust            |
| 17 | baseball.                                                    |
| 18 | Q.   Why not?                                                |
| 19 | A.   Because I was born in this game. Believe me.            |
| 20 | It's a business. Last time I played baseball was in          |
| 21 | college. I work for a living now.                            |
| 22 | Q.   Yeah?                                                   |
| 23 | A.   Yeah.                                                   |
| 24 | Q.   Okay.                                                   |
| 25 | A.   I don't trust their doctors or nothing.                 |

1    them.

2    Q. Oh, I see.

3    A. So, from the team you can purchase them.

4       I also got Greg Anderson a 73 home run ring,

5    because that's what he wanted. Okay?

6       But a friend of mine in New York makes these

7    things. And he makes them all for me. So, if I have

8    him do a big award, a friend of mine in New York will

9    just make one for me and give it to me as a gift. Greg

10   saw it, he liked it, he wanted it. Fine. He wouldn't

11   charge me for training and stuff. And I'm, like, 15 --

12   I mean, he wants it. This is the least I can do. It's

13   a $3,000 ring. He wants it, what he do, here, fine.

14       MR. NEDROW: Okay. Other factual questions,

15   yes.

16       GRAND JUROR: Greg Anderson -- would you

17   consider him an employ that works for you.

18       THE WITNESS: No. I consider him as a friend.

19       GRAND JUROR: That you pay him $15,000, is that

20   like a tax write-off for you when you do your taxes?

21       THE WITNESS: No, you can't write off that.

22       GRAND JUROR: $15,000, you can't write that

23   off?

24       THE WITNESS: It's a luxury to have a trainer.

25   It's not a tax deduction.

1     I did that for him so his kid could go to same
2  school. My daughter goes to a very expensive Montessori
3  school, and his son's over there too. And he has an
4  ex-girlfriend that won't let him see his kid, and I
5  don't want, you know, no problems. "Here, let me give
6  you something keep her off your back."
7     So, that's basically in exchange for the
8  workouts. You know, we're friends, so you, know you,
9  just give and get. That's just how it works.
10 BY MR. NADEL:
11     Q.  So, you consider that a gift, really?
12     A.  Pretty much, yeah: "Here's a gift, do what you
13 want to do with it." You know, I didn't ask any
14 questions.
15     Q.  Just to follow-up on the grand juror's
16 question, is that -- if you're giving gifts of $15,000
17 or $20,000 a year to individuals, is that something that
18 you declare on your tax returns as a gift?
19     A.  I didn't declare it on my tax returns at all,
20 no. Because they didn't want to have to pay tax on it.
21 I'm thinking: "Fifteen grand, whoop-de-doo. You know,
22 slap me on the hands, and I'll pay my taxes on it."
23     MR. NEDROW: Yes, another question.
24     GRAND JUROR: You've received a lot of training
25 from a lot of different coaches.