United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES,                                              No. CR 07-00732 SI

          Plaintiff,                              **ORDER RE: DEFENDANT'S MOTIONS**
  v.                                                      ***IN LIMINE***

BARRY LAMAR BONDS,

          Defendant.
_____/

On February 5, 2009, the Court heard oral argument on defendant's motions *in limine*. Having considered the arguments of the parties and the papers submitted, including supplemental briefs submitted after the hearing, the Court rules as follows.

**DISCUSSION**

Defendant Barry Bonds is charged with ten counts of false statement to a grand jury, in violation of 18 U.S.C. § 1623(a), and one count of obstruction of justice, in violation of 18 U.S.C. § 1503. The charges arise from defendant's testimony before a grand jury in the Northern District of California on December 4, 2003. The grand jury was investigating the distribution of anabolic steroids and other performance-enhancing drugs by the Burlingame-based Bay Area Laboratory Co-operative ("BALCO"), as well as BALCO's laundering of money gained from sales of those drugs. Pursuant to that investigation, federal agents executed search warrants on BALCO and the residence of defendant's personal trainer, Greg Anderson, on September 3, 2003. Defendant seeks to exclude several categories of evidence seized from BALCO and Anderson's residence, a tape recording purportedly made in March of 2003, and certain lay and expert testimony. The Court will consider each category of evidence in turn.

Dockets.Justia.com

**1.       Lab Results from Quest Diagnostics, Inc.**

Defendant moves to exclude documents that purport to record the results of tests performed on defendant's urine by Quest Diagnostics, Inc., a laboratory.  *See* Def. Mot. to Exclude, ex. C-1.  The documents were seized from BALCO during the execution of the search warrant on September 3, 2003. Defendant contends that the government cannot establish that the urine samples tested by Quest came from defendant and that the results of Quest's tests are therefore irrelevant.

Only relevant evidence is admissible.  *See* Fed. R. Evid. 402.  Evidence other than live testimony must be authenticated as a condition precedent to a finding of relevance.  *See* Fed. R. Evid. 901, 902; *see also* Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 9:1 (2008) (hereinafter "*Federal Evidence*").  The proponent of the evidence bears of the burden of providing evidence "sufficient to support a finding that the matter in question is what its proponent claims." *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Evid. 901(a)).  When the item is not readily identifiable – as with a blood or urine sample – authentication can be accomplished by establishing through a "chain of custody" that there is a "reasonable probability that the evidence has not been altered in any material aspect since the time of the crime" and that the evidence is relevant. *United States v. Brewer*, 630 F.2d 795, 802 (10th Cir. 1980).  "[A] defect in the chain of custody goes to the weight, not the admissibility, of the evidence introduced."  *United States v. Matta-Ballesteros*, 71 F.3d 754, 769 (9th Cir. 1995).  The existence of "[s]erious gaps in the chain or suspicious discrepancies in the records, descriptions, or quantum or nature of the material," however, "may raise enough doubt to require exclusion." *Federal Evidence* § 9:10; *see, e.g.*, *United States v. Ladd*, 885 F.2d 954, 957 (1st Cir. 1989) (lab results excluded when government failed to explain discrepancy in numbering of specimen samples).

Testimony by a witness or witnesses that blood or urine samples were taken from defendant and delivered to BALCO for testing by Quest would supply the minimal foundation for authentication.  The government contends that if Anderson testified at trial, his testimony would be that he took the samples

from defendant and gave them to BALCO employee James Valente.[1]  This testimony, in turn, would prove that the urine samples came from defendant, making the test results relevant to this action.

The government anticipates, however, that Anderson may refuse to testify.[2]  If Anderson does not testify, the government must find some other means of establishing that the samples came from defendant.[3]  The government proposes to do so through Valente's testimony that each time Anderson gave him the samples, he said something to the effect of "this is from Bonds."[4]  These out of court statements offered for their truth are, of course, hearsay.  The government seeks to admit Anderson's hearsay statements through one of several exceptions to the evidentiary bar on hearsay.  The Court will consider each in turn.

### A.    Statements against penal interest

The government argues that Anderson's statements to Valente identifying the source of the samples are admissible as statements against penal interest under Federal Rule of Evidence 804(b)(3). For a statement against interest to be admissible under 804(b)(3), the proponent must show that: (1) the declarant is unavailable as a witness; (2) at the time the statement was made, it was "so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *See* Fed. R. Evid. 804(b)(3).  "Whether a statement is in fact

---

[1]  The government evidently assumes that this would be Anderson's testimony.  No evidence has been presented that Anderson previously made such representations to the government or to anyone else.

[2]  After being ordered to do so, Anderson refused to testify at the grand jury proceeding which led to defendant's current indictment.  Anderson was held in civil contempt of court and imprisoned for the balance of the grand jury's term, a period of over 12 months.

[3]  The government also seeks to introduce defendant's grand jury testimony that he gave samples of his urine to Anderson for testing at BALCO.  This testimony does not help the government because it does not establish that the particular samples that are the subject of the Quest records were among those that defendant gave to Anderson.

[4]  Valente's grand jury testimony makes clear that he did not have personal knowledge of the source of the samples.  He told the grand jury that "there was no chain of custody on the urine." *See* Def. Reply, ex. A, Tr. 54:18-19.  He also testified that he knew the samples were defendant's urine "'Cause Greg gave it to me and told me." *See id.* Tr. 55:11.

1   against interest must be determined from the circumstances of each case." *Williamson v. United States*,

2   512 U.S. 594, 604 (1994).

3       The first requirement will be met if Anderson refuses to testify at trial. *See* Fed. R. Evid.

4   804(a)(2). As for the second requirement, the parties dispute what it means for a statement to be

5   contrary to the declarant's penal interest. According to defendant, the statement must be a confession

6   made to law enforcement or an open admission of guilt that the declarant knows at the time of the

7   utterance will be used against him in a criminal proceeding. The government urges a broader reading

8   of the rule – according to the government, the statement need only "tend to" subject the declarant to

9   liability.

10      The Court agrees with the government that the Ninth Circuit requires a broad reading of Rule

11  804(b)(3). *United States v. Paguio*, 114 F.3d 928, 933 (9th Cir. 1997) ("The word 'tending' broadens

12  the phrase, so that the statement need not be a plain confession making the difference between guilty

13  and not guilty.") (citing *United States v. Slaughter*, 891 F.2d 691, 698 (9th Cir. 1989)). The logic of

14  Rule 804(b)(3) – that a reasonable person would not falsely subject himself to criminal liability – also

15  requires, however, that the statements "in a real and tangible way[] subject the declarant to criminal

16  liability. A showing that the statements solidly inculpate the declarant is required." *United States v.*

17  *Monaco*, 735 F.2d 1173, 1176 (9th Cir. 1984) (internal citations omitted).

18      It is not evident to the Court how Anderson would have subjected himself to criminal liability

19  by saying, "This sample is from Bonds." The government argues that Anderson's statement is

20  tantamount to an admission that he was attempting to determine whether steroids were detectable in the

21  urine and that he knew this activity would have subjected him to criminal liability because he

22  subsequently pleaded guilty to "a criminal offense related to his steroid dealings" at BALCO. Gov't

23  Opp., at 34. This attenuated theory of liability will not do. The statements in question did not tend to

24  inculpate Anderson because there is nothing criminal about submitting a urine or blood sample for

25  analysis at a laboratory. Anderson pleaded guilty to money laundering and conspiring to distribute and

26  possess with intent to distribute anabolic steroids.[5] His admissions that he distributed illegal drugs and

27

28  _____

    [5] *See U. S. v. Conte, et al.*, CR 04-0044. Valente pleaded guilty only to conspiracy.

4

1    laundered money do not prove that he ever believed that it was against his penal interest to admit that

2    he submitted defendant's urine samples to BALCO for testing. The Court finds that Anderson's

3    statements are not admissible under Rule 804(b)(3).

4

5          **B.     Co-conspirator statements**

6          The government argues that Anderson's statements to Valente are admissible as co-conspirator

7    statements under Federal Rule of Evidence 801(d)(2)(E). Statements "by a coconspirator of a party

8    during the course and in furtherance of the conspiracy" are admissible if offered against a party.

9    *See* Fed. R. Evid. 801(d)(2)(E). The proponent of the evidence must show: (1) that the declaration was

10   in furtherance of the conspiracy; (2) that the declaration was made during the course of the conspiracy;

11   and (3) that there is independent proof of the existence of the conspiracy and of the connection of the

12   declarant and the defendant with it. *See United States v. Perez*, 658 F.2d 654, 659 (9th Cir. 1981).

13   "[T]o be 'in furtherance' the statements must further the common objectives of the conspiracy or set in

14   motion transactions that are an integral part of the conspiracy." *United States v. Yarbrough*, 852 F.2d

15   1522, 1535 (9th Cir. 1988) (citation omitted).

16         The government claims that Anderson and Valente were engaged in a conspiracy to "defraud

17   the United States through illicit distribution of misbranded drugs," *see* Gov't Opp. at 25, and that

18   Anderson identified defendant's samples to Valente in furtherance of that conspiracy. This theory fails

19   for at least two reasons. First, as discussed above, Valente and Anderson admitted to conspiring to

20   distribute anabolic steroids. Their guilty pleas do not establish that Anderson gave defendant's urine

21   samples to Valente in furtherance of their drug distribution conspiracy. Second, even if Anderson's

22   statements identifying the urine samples did further the distribution conspiracy, neither Valente nor

23   Anderson is a party to this case. The government asserts that defendant was a co-conspirator because

24   he submitted samples for testing in order to help BALCO employees create undetectable drugs. The

25   government has offered no proof, however, of defendant's purpose in submitting the samples that

26   Anderson identified for Valente. The government therefore has not established that defendant acted

27   with an intent to further the conspiracy when he gave samples of his urine to Anderson. Accordingly,

28   Anderson's statements are not admissible under Rule 801(d)(2)(E).

**C.     Residual exception**

Under Federal Rule of Evidence 807, a hearsay statement is admissible if (1) it has "circumstantial guarantees of trustworthiness," that are "equivalent" to those in Rules 803 or 804, (2) is offered as evidence of a material fact, (3) is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, (4) the general purposes of the Rules of Evidence and the interests of justice will best be served by admission of the statement into evidence, and (5) the adverse party is notified sufficiently in advance of the trial to have a fair opportunity to prepare. Fed. R. Evid. 807. This rule is not to be used as a "broad hearsay exception, but rather is to be used rarely and in exceptional circumstances." *Fong v. American Airlines, Inc.*, 626 F.2d 759, 763 (9th Cir. 1980).

According to the government, Anderson's statements are admissible under Rule 807. The government maintains that if Anderson refuses to testify, the Court will be presented with "exactly the type of scenario that the residual exception was intended to remedy." Gov't Opp., at 35. It is difficult to see how Anderson's anticipated refusal to testify represents an "exceptional" circumstance – the Rules of Evidence provide for precisely the circumstances now before the Court. Rule 804 governs situations when a witness is "unavailable" to testify and provides that one such scenario occurs when the declarant "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." Fed. R. Evid. 804(a)(2).

In addition, in all of the cases relied on by the government, there were far greater guarantees of trustworthiness than are present in this case.[6] Here, Valente testified before the grand jury that on at least one occasion, he mislabeled a sample. *See* Def. Reply, at ex. A, Tr. 120:1-11.[7] In addition, letters

---

[6]     *See United States v. Sanchez-Lima*, 161 F.3d 545, 548-59 (9th Cir. 1998) (statements were videotaped and made under oath and the adverse party had an opportunity to cross examine the declarants when the statements were made); *United States v. Valdez-Soto*, 31 F.3d 1467, 1472 (9th Cir. 1994) (declarant testified at trial); *United States v. Bachsian*, 4 F.3d 796, 799 (9th Cir. 1993) (shipping records regularly relied on by U.S. Customs); *United States v. Friedman*, 593 F.2d 109, 119 (9th Cir. 1979) (Chilean official's summary of official immigration records trustworthy because it recorded dates of entry and exit and involved no statements of a testimonial nature).

[7]     Valente's testimony was as follows:
A. Yeah, he just asked. He said, "Do me a favor. Can you switch my name for Barry's" and I said, "If that's what you want to do" and he said, "Yeah," and I said, "Okay."

from Valente to Quest state that multiple samples attributed to defendant were requested by a "Dr. Goldman." *See* Def. Reply, at ex. B. Valente testified to the grand jury, however, that he never he never heard or saw Dr. Goldman, the medical director of BALCO, consult with defendant. *See id.* at ex A, Tr. 104:10-18. In light of this evidence that on occasion BALCO employees tampered with the labels of samples, the Court cannot find that the requisite guarantees of trustworthiness are present in this case. The statements are not therefore admissible under Rule 807.

**D. Speaking agent and agent-servant statements**

At oral argument, the government proposed two new theories of admissibility for Anderson's statements identifying the urine samples: statements authorized by a party (Rule 801(d)(2)(C)) and statements of an agent (Rule 801(d)(2)(D)). The Court permitted the parties to submit additional briefing on the applicability of these rules.

Under Federal Rule of Evidence 801(d)(2)(C), a statement is not hearsay if it is offered against a party and is "a statement by a person authorized by the party to make a statement concerning the subject." *See* Fed. R. Evid. 801(d)(2). "Merely hiring someone to do some task does not impart authority to speak" although speaking authority may exist because of the nature of the relationship and the task the speaker is to perform, as in the case of attorneys, brokers and sales personnel, and persons who are given managerial or supervisory responsibilities. *See Federal Evidence* § 8:50. The government must establish the preliminary questions of admissibility under Rule 801(d)(2) by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 176 (1987) ("when the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence"); *see also* Fed. R. Evid. 801(d)(2)(C) advisory committee's note, 1997 Amendment (extending reasoning of *Bourjaily* to statements offered under subdivisions (C) and (D) of Rule 801(d)(2)).

Q. And – and just so we're clear. I guess what you said earlier, was there a concern stated by Mr. Anderson that Mr. Bonds wanted some privacy or was concerned about it for some reason?
A. Yes. He just said – he said Barry wanted, you know, some privacy, so he didn't want his name on it.

7

The government contends that the nature of the task Anderson was required to perform – the delivery of defendant's samples to BALCO – implicitly conferred on Anderson the authority to identify the source of those samples. In support of this theory, the government offers defendant's grand jury testimony that Anderson asked defendant to provide blood or urine samples for testing in 2000 or 2001, and that from 2000 or 2001 until the time of defendant's testimony, defendant provided "five or six" blood samples and "maybe four" urine samples. *See* Gov't Supp. Opp., at ex. B, Tr. 76:24; 18:12-24. Each time he was asked how many samples he provided, defendant began his response by saying "Oh, I can't recall" or "I don't know." *See id.*

This testimony does not establish by a preponderance of the evidence that Anderson was authorized to say "This sample comes from Barry Bonds" each time he gave a sample to BALCO. First, defendant's testimony establishes that he provided the samples in response to a request from Anderson, not that defendant hired Anderson to perform this task. Second, defendant's equivocal answers about the number of samples he gave Anderson are not sufficiently certain to establish that Anderson had authority to speak with regard to the particular samples at issue here. Finally, the rationale for Rule 801(d)(2)(C) simply does not apply here. If a party authorizes a declarant to speak on his behalf and the declarant makes an admission, Rule 801(d)(2)(C) provides a mechanism for that admission to be used against the party. Trainers, unlike lawyers, brokers, sales personnel, and those with supervisory responsibilities, are not generally authorized to speak for principals. In addition, Anderson's statement identifying the source of the samples is not an "admission" of the type contemplated by Rule 801(d)(2)(C) because, as discussed above, the government has not established that it was against Anderson's interest to identify the samples for Valente. Anderson's statements are therefore not admissible under Rule 801(d)(2)(C).

Federal Rule of Evidence 801(d)(2)(D) provides that "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" is admissible if offered against the party. *See* Fed. R. Evid. 801(d)(2). The Rule provides a hearsay exception for statements by employees or agents. *See Federal Evidence* § 8:53. In the Ninth Circuit, independent contractors do not qualify as agents for the purposes of Rule 801(d)(2)(D). *See Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1440 (9th Cir. 1990).

Although it appears to be undisputed that Anderson was defendant's trainer, the government has not cited any evidence of the nature of their relationship. For example, it is not evident that defendant even paid Anderson, much less whether Anderson was an employee rather than an independent contractor.[8] Accordingly, the government has not established by a preponderance of the evidence that Anderson was defendant's agent or that the task of identifying defendant's samples was within the scope of Anderson's agency. Anderson's statements are therefore not admissible under Rule 801(d)(2)(D).

Having determined that Anderson's hearsay statements to Valente do not qualify for any of the hearsay exceptions proposed by the government, the Court concludes that if Anderson does not testify at trial, these statements are inadmissible. This ruling leaves the government without evidence that the information in the Quest records pertains to urine samples that came from defendant. Under these circumstance, this is not a case in which the chain of custody has a few "rusty" links. *See Ladd*, 885 F.2d at 957. Rather, crucial pieces of the chain are missing altogether. Accordingly, if Anderson continues to refuse to testify, defendant's motion is GRANTED with respect to the records from Quest.

## 2. BALCO Log Sheets

Defendant seeks to exclude documents that the government describes as log sheets that Valente created to record the receipt of urine samples tested at BALCO, the assignment of identification numbers to samples, and the results of analyses performed on each sample by outside labs. *See* Def. Mot., ex. C.2.b. The government's proffer is that Valente will testify that he recorded certain samples as being defendant's urine based on Anderson's statement that the samples were from defendant. Gov't Opp., at 31. Accordingly, even if these documents qualify as business records, they are not relevant because the government cannot link the samples to defendant without Anderson's testimony. If Anderson does not testify at trial, defendant's motion to exclude entries in the log sheets that are based on Anderson's hearsay statements is GRANTED.

---

[8] Defendant testified to the grand jury that he did not pay Anderson but gave him a $3,000 ring as a gift. Def. Supp. Reply, ex. A, Tr. 135:9-13.

United States District Court
For the Northern District of California

### 3.     Lab Results from LabOne and Specialty Laboratories

Defendant moves to exclude documents that purport to record the results of tests performed on defendant's blood by LabOne and Specialty laboratories. *See* Def. Mot. to Exclude, ex. C-1. As with the urine samples discussed above, defendant contends that the government cannot establish that the blood samples tested by LabOne and Specialty came from defendant and that the results of the labs' tests are therefore irrelevant.

The government seeks to authenticate the LabOne and Specialty records through the testimony of a Dr. Ting. According to the government, Dr. Ting will testify that he drew defendant's blood and gave the samples to Anderson. Dr. Ting will also testify that BALCO gave the samples to LabOne and Specialty. The government does not, however, explain the basis for Dr. Ting's testimony about how BALCO's records came to contain information identifying the blood samples as coming from defendant. Without admissible evidence of this link, the foregoing discussion establishes that the lab results are not relevant. If the government cannot lay foundation establishing that the BALCO records pertained to blood samples taken from defendant, defendant's motion to exclude the records of LabOne and Specialty is GRANTED.

### 4.     Calendars Seized from the Residence of Greg Anderson

#### A.     Calendars purportedly pertaining to defendant

Defendant seeks to exclude calendars seized on September 3, 2003 from the residence of Greg Anderson. The government describes the documents as "doping calendars" and contends that Anderson distributed steroids to defendant consistent with the notations on the calendars. The documents are offered for the truth of the matter asserted – that defendant did receive drugs from Anderson on the dates noted in the calendars – and are therefore hearsay. The government seeks to admit the calendars through several exceptions to the evidentiary bar on hearsay. The Court will consider each exception in turn.

#### i.     Business records

The business records exception, Federal Rule of Evidence 803(6), exempts from exclusion documents that are (1) prepared at or near the time of the event recorded, (2) in the regular course of

10

1  business, (3) by one with personal knowledge of the information recorded, unless "the source of

2  information or the method or circumstances of preparation indicate lack of trustworthiness." *See United*

3  *States v. Orellana-Blanco*, 294 F.3d 1143, 1140 n.16 (9th Cir. 2002) (citing Fed. R. Evid. 803(6)). If

4  Anderson does not testify, the government intends to lay the requisite foundation through (1)

5  Anderson's statement to former IRS Special Agent Jeff Novitzky when the search warrant was executed

6  and (2) testimony of other athletes who allegedly received similar calendars from Anderson that their

7  calendars accurately record the drugs they received from Anderson.

8      The Court finds that the evidence proffered by the government does not establish that the

9  calendars are admissible as business records. First, when Agent Novitzky executed the search warrant

10 on Anderson's residence, Anderson purportedly admitted that he distributed steroids and other drugs

11 to athletes but refused to answer questions about defendant. The government did not cite *Crawford v.*

12 *Washington*, 541 U.S. 36 (2004), in its brief and did not explain at oral argument why the introduction

13 of this statement, made to a law enforcement officer to prove facts relevant to a later criminal

14 prosecution, would not violate the Confrontation Clause. *See Crawford*, 541 U.S. at 59 (testimonial

15 statements of witnesses absent from trial are admissible only where the declarant is unavailable and the

16 defendant has had a prior opportunity to cross-examine him); *Davis v. Washington*, 547 U.S. 813, 822

17 (2006) (statements taken by police officers are testimonial when there is no ongoing emergency and the

18 "primary purpose" of the interrogation is to "establish or prove past facts potentially relevant to later

19 criminal prosecution."). Moreover, even if Anderson's statement to Novitzky were admissible,

20 Anderson's admission that he distributed anabolic steroids to other athletes does not establish that the

21 calendars in question were regularly maintained records of Anderson's distribution of drugs to

22 defendant.

23      Second, the government concedes that the other athletes who received calendars from Anderson

24 have no knowledge of the contents of the calendars that purportedly pertain to defendant. Gov't Opp,

25 at 20. These athletes therefore will not be able to lay foundation about the circumstances under which

26 Anderson prepared the calendars pertaining to defendant. *See* Fed. R. Evid. 803(6). Accordingly, if

27 Anderson does not testify at trial, the calendars are not admissible as business records.

28

ii.    **Statements against interest**

The government contends that the calendars are admissible as statements against Anderson's

penal and pecuniary interest under Rule 804(b)(3). If so, the government must establish that at the time

Anderson made each entry in the calendar, he knew that his written statements would tend to subject

him to criminal or civil liability or to harm his financial interests.

The government intends to lay foundation that Anderson knew his activities could subject him

to criminal liability by introducing Anderson's statement to Agent Novitzky during the execution of the

search warrant that Anderson did not believe it was a "good idea" to have his name on packages of

drugs sent to athletes, as well as evidence that Anderson stored the calendars in a closet, indicated drug

names on the calendars using codes, identified defendant only by his initials, and refused to answer

questions about defendant.

As discussed above, the government has not explained why introducing Anderson's statement

to Agent Novitzky would not violate the Confrontation Clause. Even if the Court were to consider this

statement and the other acts cited by the government, none of this evidence supports the government's

contention that Anderson believed when he created the calendars that they could subject him to civil or

criminal liability. First, Anderson's statement to Agent Novitzky and his placement of the files in a

closet are not probative of Anderson's state of mind when he made the notations. The only

contemporaneous evidence – that he referred to drugs with lengthy names in code and designated

defendant by his initials – is ambiguous. It is equally plausible that Anderson used code and initials in

the calendars for convenience. The letters "B.B." are not, after all, particularly cryptic. Without more

evidence of the circumstances under which Anderson made the calendars, the Court cannot determine

whether he believed they tended to be against his penal interest when he made them.

The government also argues that Anderson's notations in the calendars must have been true

because he would have been "ruined financially" if he had made false statements about defendant's

steroid use. Gov't Opp., at 24. Defendant responds that this reasoning turns the logic of the pecuniary

interest exception on its head. The Court agrees. A statement against pecuniary interest is considered

trustworthy because the declarant would have no reason to say something that would hurt him

financially. Here, as the government notes, Anderson's connection to defendant was financially

beneficial to Anderson. Anderson could have tried to recruit athletes as clients by fabricating the calendars in order to portray defendant as a long-time client. The circumstances that allow the application of the hearsay exception – that no reasonable person would say this if it were not so – are not present here. Accordingly, the calendars are not admissible under Rule 804(b)(3).

### iii.    Co-conspirator statements

The government seeks to admit the calendars as the statements of a co-conspirator under Rule 801(d)(2)(E). The government contends that defendant was a co-conspirator in Anderson and Valente's drug distribution scheme. As discussed above, this theory fails because the government has not provided any evidence that defendant gave BALCO his urine and blood samples in furtherance of the distribution conspiracy. The calendars are therefore not admissible under Rule 801(d)(2)(E).

### iv.    Residual exception

The government contends that the calendars should be admitted under Rule 807 because they are trustworthy for all of the reasons set forth in their discussion of the other hearsay exceptions. For the reasons discussed above, there is not sufficient evidence of the circumstances in which the calendars were created for the Court to make this determination. The Court therefore finds that the calendars cannot be admitted under Rule 807.

Anderson's hearsay statements in the calendars are not admissible under any of the hearsay exceptions proposed by the government. Accordingly, if Anderson does not testify at trial, defendant's motion to exclude the calendars is GRANTED.

### B.    Calendars purportedly pertaining to other athletes

The government seeks to introduce calendars that Anderson allegedly created for other athletes to whom he distributed steroids. The government contends that these calendars are relevant to prove that the calendars discussed above recorded Anderson's distribution of drugs to defendant. If those calendars are inadmissible, it follows that the calendars pertaining to other athletes are not relevant.

Accordingly, if the calendars that purportedly refer to defendant are inadmissible, defendant's motion to exclude the calendars of other athletes is also GRANTED.

**5.      Handwritten Notes**

Defendant seeks to exclude five pages of handwritten notes seized during searches of Anderson's residence and BALCO. *See* Def. Mot, ex. C-2-c, 113, 23955, 23826, 23837, 23844. Assuming that these documents can be authenticated, the government contends that the one page from BALCO is admissible as a business record and that the four pages seized from the Anderson residence are admissible as statements against penal interest, co-conspirator statements, or business records of Anderson's "steroid trafficking enterprise."

Defendant's motion is DENIED with respect to the page from BALCO, without prejudice to defendant renewing this objection at trial if the government is unable to establish that this note qualifies as a business record under Rule 803(6).

For the reasons discussed above, without Anderson's testimony, the records from his residence do not qualify as statements against penal interest, co-conspirator statements, business records, or under the residual exception. Accordingly, if Anderson does not testify at trial, defendant's motion is GRANTED with respect to the handwritten notes seized from Anderson's residence.

**6.      Tape Recorded Statements**

Defendant seeks to exclude a tape recording of a conversation between Anderson and Steve Hoskins, who is described by the government as defendant's childhood friend and personal assistant beginning in 1993. The recording was made by Hoskins in the Giants locker room in March of 2003. The government contends that Anderson's statements are admissible under Rule 804(b)(3) as statements against interest. The government proffered that Hoskins recorded the following exchange (portions of the conversation are designated as A, B, and C for ease of discussion):

> **A**
> Hoskins: You know, um, when Barry's taking those shots, Dr. Ting said that one of, one of the basketball players . . . he's was taking them shots, and doing it in his thigh . . . and he's . . . oh shit . . . it's fuckin' . . .
> Anderson: Oh, I know. Yeah, you can't even, you can't even walk after that.

14

Hoskins: Yeah, no, he said he had to go in and graft his . . .

Anderson: Oh yeah, you know what happened? He got uh . . .

Hoskins: He must have put it in the wrong place.

Anderson: No, what happens is, they put too much in one area, and what it does, it 'ill, it 'ill actually ball up and puddle. And what happens is, it actually will eat away and make an indentation. And it's a cyst. It makes a big fuckin' cyst. And you have to drain it. Oh yeah, it's gnarly . . . Hi Benito . . . oh it's gnarly.

Hoskins: He said his shit went . . . that's why he has to, he had to switch off of one cheek to the other. Is that why Barry's didn't do it in one spot, and you didn't just let him do it one time?

Anderson: Oh no. I never. I never just go there. I move it all over the place. . . .

Hoskins: Yeah, that's why he was like . . . (laughs) he was like, tell Greg if he's puttin' it in one fuckin' place, to tell him to move that shit somewhere else.

Anderson: Oh no, no, no. I learned that when I first started doing that shit . . . sixteen years ago, . . . because uh . . . guys would get a gnarly infections . . . and it was gross . . . I mean, to the point where you had to have surgery just to get that fuckin' thing taken out. . . .

**B**

Hoskins: What if they decide that . . . I think, didn't they say they're going to test . . . um . . . they don't know. They're not testing the players yet. They're just doing random shit. So they're just going to get a percentage. And then after they figure out the percentage . . . then if it's high enough, then they'll do whatever.

Anderson: Well, what, what I understand is that, what they're doing is they're . . . um . . . they're, they did 25 players, random, supposedly, in spring training.

Hoskins: Oh, so you don't even . . .

Anderson: And then, so those guys have already been tested twice. They got tested, then a week later they got tested again. Same guys. So what happens is, is those guys are pretty much done for the year.

Hoskins: Okay.

Anderson: They don't ever have to get tested again. Now supposedly, there's gonna be three guys . . . excuse me, not three . . . one hundred and fifty guys tested during, random during the season . . . which he's going to be on that list, easy . . .

Hoskins: Oh yeah, definitely.

Anderson: So, in that . . . after . . . but they're going to test him once, then test him again. And then after, he supposed to be . . .

Hoskins: But do we know?

Anderson: Do we know when they're going to do it?

Hoskins: Yeah. Does he know?

Anderson: I, I, I have an idea. See I gotta . . ., where, where the lab that does my stuff, is this lab that does entire baseball . . .

Hoskins: Oh okay. Oh the same . . .

Anderson: Yeah. So, they . . . I'll know . . . I'll know like probably a week in advance, or two weeks in advance before they're gonna do it. But it's going to be in either the end of May, beginning of June. It's right before the All-Star break definitely. So after the All-Star break . . . fucking, we're like fucking clear as a mother.

Hoskins: Okay, so what you want . . . so they'll . . . the guys from Major League Baseball . . . so baseball will tell, you'll know when they're gonna do it, but you won't know exactly if it's gonna be him.

Anderson: Right

Hoskins: Or will you know . . .

Anderson: He may not even get tested.

Hoskins: Right, that's what I'm saying.

Anderson: Because it's supposed to be computerized.

15

Hoskins: But we just know if . . . he's gonna be . . .
**C**
Anderson: He's gonna be. But the whole thing is . . . everything that I've been doing at this point, it's all undetectable.
Hoskins: Right.
Anderson: See, the stuff that I have . . . we created it. And you can't, you can't buy it anywhere. You can't get it anywhere else. But, you can take it the day of and pee . . .
Hoskins: Uh-huh.
Anderson: And it comes up with nothing.
Hoskins: Isn't that the same shit that Marion Jones and them were using?
Anderson: Yeah, same stuff, the same stuff that worked at the Olympics.
Hoskins: Right, right.
Anderson: And they test them every fucking week.
Hoskins: Every week. Right, right.
Anderson: So that's why I know it works. So that's why I'm not even trippin'. So that's cool.

As an initial matter, defendant contends that the statements should be excluded under Rule 104(b) as irrelevant because it is not evident that the parties are discussing defendant. *See* Fed. R. Evid. 104(b) ("When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."). The Court disagrees. Hoskins begins the conversation by referring to "Barry." A trier of fact could conclude that the parties – defendant's close friend and personal trainer – were discussing defendant, Barry Bonds. Defendant contends that the setting of the conversation – a men's locker room – is an inherently untrustworthy place, but a trier of fact could find that the informal setting made it more likely that Anderson would speak candidly to Hoskins.

In the section labeled "B," Anderson describes what a trier of fact could reasonably conclude was his strategy for evading Major League Baseball's procedures to test for the use of steroids. The government has not established that it was a criminal or civil offense in 2003 to help athletes evade detection by professional sports associations. Accordingly, the statements in section B are not admissible as statements against interest.[9]

In the section labeled "A," Anderson appears to discuss techniques to avoid infections when injecting a substance. Based on the section of the conversation labeled C, a trier of fact could conclude

---

[9] The government argues that Anderson's statements are also admissible under the residual hearsay exception, Rule 807. The Court disagrees. As discussed above, the fact that Anderson is not available for trial is not an "exceptional" circumstance and the authorities relied on by the government had stronger guarantees of trustworthiness than are present in this case.

that the substance in question is the "same stuff" being used by runner Marion Jones and other athletes at the Olympics. In section C, Anderson says that he created this substance and assures Hoskins that it is undetectable. The question, then, is whether Anderson could reasonably have believed in March of 2003 that his admissions that he created and injected an undetectable substance into defendant might subject him to criminal or civil liability. If the substance in question was illegal, it follows that Anderson could have faced criminal liability for his acts. At oral argument, the parties disputed whether the drugs known as the "cream" and the "clear" were illegal in 2003. If Anderson's statements are to be admissible as statements against penal interest, the government will have to lay foundation at trial that when Anderson discussed the "stuff that worked at the Olympics," he was referring to a substance that was illegal in March of 2003.[10] Accordingly, defendant's motion to exclude the part of the conversation labeled B is GRANTED. Defendant's motion with respect to the parts of the conversation labeled A and C is DENIED without prejudice.

**7.    Lay and Expert Opinion**

Defendant seeks to exclude the proffered expert testimony of Dr. Larry Bowers on physical symptoms exhibited by individuals who use anabolic steroids and human growth hormone ("HGH"). Dr. Bowers opines that anabolic steroids can cause the following effects:

> increased hair growth on the trunk and extremities (primarily in women), male pattern baldness, the development of acne, particularly on the upper back, decrease in testicular size, increased aggressiveness, feelings of invincibility, "roid rage," weakening of the heart, hypertension, injury to the liver and possible links to prostate cancer.

*See* Gov't Supp. Opp., Supp. Decl. of Larry D. Bowers ¶ 3 ("Bowers Decl. II"). As for HGH, Dr. Bowers opines that side effects can include "an increase in the size of one's head or skull, jaw, hands and fingers, and feet and toes, as well as improved eyesight." *Id.* ¶ 5.

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert testimony under Rule 702 must be both relevant

---

[10]    The Court notes that "the clear," or Tetrahydrogestrinone, was not listed as a controlled substance in 2003. The government stated at oral argument that "the cream" contains testosterone. Testosterone was a controlled substance in 2003. *See* 21 U.S.C. § 802(41)(a)(xxvi) (2003).

and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 n.7 (9th Cir. 2002), amended by 319 F.3d 1073 (9th Cir. 2003). Expert testimony that does not relate to any issue in the case "is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted). This consideration has been described as one of "fit," i.e. "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (citation omitted).

When considering evidence proffered under Rule 702, the trial court must act as a "gatekeeper" by making a preliminary determination that the expert's proposed testimony is reliable. *Id.* at 1063. "As the Supreme Court emphasized, however, '[t]he inquiry envisioned by Rule 702 is . . . a flexible one,' . . . and must be 'tied to the facts of a particular case.'" *Id.* (citing *Daubert*, 509 U.S. at 594, and *Kumho Tire v. Carmichael*, 526 U.S. 137, 150 (1999)). Expert testimony is subject to the general liberality of the federal rules of evidence. *Daubert*, 509 U.S. at 588. Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible [expert] evidence." *Id.* at 596.

Defendant argues that Dr. Bowers' opinion should be excluded because it is not sufficiently reliable. Dr. Bowers is the senior managing director of the United States Anti-Doping Agency, a Colorado-based organization that seeks to deter the use of performance-enhancing drugs in Olympics, Paralympic, and Pan American athletic competitions by, among other activities, testing athletes for drugs. Gov't Opp., ex. 2, Decl. of Larry D. Bowers ("Bowers Decl. I") ¶ 1. Prior to his current position, he worked for eight years as a professor in the department of pathology and laboratory medicine at Purdue University. *Id.* He has authored numerous scholarly articles on athletic drug testing and has presented his work at scientific meetings. *Id.* Dr. Bowers states that the side effects of anabolic steroids are described in at least two medical texts and fourteen peer-reviewed articles, and that it is "generally accepted knowledge within the scientific community that anabolic steroids can cause a variety of side effects." Bowers Decl. II. ¶ 4(a-c). He claims that his opinion about the side effects of HGH is supported by at least two medical texts and five peer-reviewed articles, as well as his conversations with

scientists at pharmaceutical companies about the side effects they have noted in their clinical trials with HGH. *Id.* ¶ 6(a-b).

Defendant claims that Dr. Bowers' opinions about the side effects of anabolic steroids and HGH have virtually no scientific support. Defendant relies on the declaration of Dr. Ronald Swerdloff, a medical doctor with specializations in endocrinology and internal medicine, who is director of the Harbor-UCLA Reproductive Program. Def. Supp. Reply, ex. B ¶ 1. Dr. Swerdloff reviewed the medical textbooks and articles cited by Dr. Bowers and claims that none of them provides support for several of the physical effects that Dr. Bowers describes. *Id.* ¶¶ 4-6. Dr. Swerdloff also challenges the methodology of some of the studies. *Id.* ¶ 4d.

The Court finds that defendant's challenge to Dr. Bowers' testimony is best presented through "[v]igorous cross-examination [and] presentation of contrary evidence" at trial. *See Daubert*, 509 U.S. at 596. If defendant's expert can demonstrate at trial that the effects Dr. Bowers describes have not been observed in clinical trials or are not described in the texts he cites, the jury may take this contrary testimony into account when deciding how much weight to give Dr. Bowers' opinion. Dr. Bowers' professional experience in the field of athletic drug testing and his peer-reviewed scholarly work satisfy the Court that it may rely on Dr. Bowers' characterization of the literature on the side effects of anabolic steroids and HGH. Accordingly, the Court finds that Dr. Bowers' opinion is sufficiently reliable to be admitted under Rule 702.

Defendant also argues that Dr. Bowers' testimony should be excluded because it is not relevant. That is, defendant claims there is no "fit" between Dr. Bowers' proffered testimony and the facts at issue in this case. The Court disagrees. Dr. Bowers' testimony will help the jury understand the typical effects of using anabolic steroids and HGH. If defendant developed any of the symptoms described by Dr. Bowers during the period in question, such evidence would be probative of whether defendant had been exposed to such substances. This evidence could, in turn, be probative evidence concerning the charges in the indictment. The Court will therefore require an offer of proof from the government before Dr. Bowers testifies establishing that there is or will be evidence in the record that defendant developed some of the symptoms Dr. Bowers will describe. Subject to an adequate offer of proof, the Court finds that Dr. Bowers's proffered testimony is relevant.

Defendant's motion to exclude the expert opinion of Dr. Bowers on the side effects of HGH and anabolic steroid use is DENIED without prejudice.

In his motions *in limine*, filed well prior to the final pretrial conference in this matter, defendant also moved to exclude improper opinion evidence from lay witnesses. The government responded to the motion *in limine* by asserting that its "lay witnesses will testify only to changes that they observed in Bonds' physical or mental condition; they will not offer an opinion on whether those changes were the result of Bonds' use of steroids." Gov't Opp., at 52. In general, such proffered testimony might properly be within the realm of lay testimony and relevant if it is based on an adequate factual foundation and is consistent with symptoms described by Dr. Bowers. After the motions *in limine* were briefed, the parties submitted their final pretrial paperwork, including their lists of anticipated witnesses. The government lists only one lay witness, Kimberly Bell, who is anticipated to testify to changes observed in defendant's body. The Court notes that some of her anticipated testimony may be subject to challenge based on foundation, relevance or unfair prejudice. Accordingly, the Court directs the government to file, under seal, a declaration from Kimberly Bell containing as complete an offer of proof as she is able to make at this time, as well as the foundation for her testimony. The Court will use Ms. Bell's submission to determine whether her proposed testimony is admissible under Fed. R. Evid. 401, 402, 403 and/or 701. **The government shall file this offer of proof by February 24, 2009.**

## 8. Materiality

The government has argued that almost every item of contested evidence is admissible for the non-hearsay purpose of proving materiality. The government must prove as an element of 18 U.S.C. § 1623(a) that defendant's statements were material to the grand jury investigation, i.e. that they had "a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it is addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (internal citations omitted). The Court does not rule on non-hearsay uses of the disputed evidence at this time. As guidance for trial, the Court notes that the government cannot use the broad definition of materiality in *Gaudin* to bootstrap otherwise inadmissible evidence into this case. Should the government seek to admit the evidence

excluded in this order to prove materiality, the Court will expect some showing that the particular aspect of materiality cannot be easily proven through another means.

**IT IS SO ORDERED.**

Dated: February 19, 2009

SUSAN ILLSTON
United States District Judge