Pages 1 — 63

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
   vs.                             )  NO. CR 07-0732 SI
                                   )
BARRY LAMAR BONDS,                 )
                                   )  San Francisco, California
            Defendant.             )
                                   )  Thursday, February 5, 2009
_____)  10:32 a.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          JOSEPH P. RUSSONIELLO
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                   BY:  MATTHEW A. PARRELLA
                        JEFFREY R. FINIGAN
                        JEFFREY DAVID NEDROW
                        J. DOUGLAS WILSON
                        Assistant United States Attorneys


For Defendant:          LAW OFFICES OF ALLEN RUBY
                        125 South Market Street
                        Suite 1001
                        San Jose, California  95113
                   BY:  ALLEN RUBY, ESQ.
                        AND
                        Arguedas, Cassman & Headley, LLP
                        803 Hearst Avenue
                        Berkeley, California 94710
                   BY:  CRISTINA C. ARGUEDAS, ATTORNEY
                        TED W. CASSMAN, ESQ.
                        MICHAEL WALTER ANDERSON, ESQ.

(Appearances continued, next page)

APPEARANCES, CONTINUED:


Also For Defendant:     Riordan & Horgan
                        523 Octavia Street
                        San Francisco, California  94102
                  BY:  DENNIS PATRICK RIORDAN, ESQ.
                        DONALD MEREDITH HORGAN, ESQ.



Reported By:     Belle Ball, CSR 8785, RMR, CRR
                      Official Reporter – US District Court

1  FEBRUARY 5, 2009                                    10:32 A.M.

2                        **P R O C E E D I N G S**

3          **THE CLERK:**  Calling Criminal 07-732, United States

4  versus Barry Bonds.  Counsel, please state your appearances for

5  the Record.

6          **MR. PARRELLA:**  For the Government, Matt Parrella,

7  Jeff Nedrow, Jeff Finigan, and Doug Wilson.  Good morning,

8  Your Honor.

9          **THE COURT:**  Good morning.

10          **MR. RUBY:**  Good morning, Your Honor.  My name is

11  Allen Ruby.  Mr. Bonds is personally present.

12          **THE COURT:**  Good morning.

13          **MS. ARGUEDAS:**  Good morning.  Cris Arguedas, also for

14  Mr. Bonds.

15          **THE COURT:**  Good morning.

16          **MR. CASSMAN:**  Good morning, Your Honor.  Ted Cassman,

17  also for Mr. Bonds.

18          **THE COURT:**  Good morning.

19          **MR. RIORDAN:**  Good morning, Your Honor.  Dennis

20  Riordan and Donald Horgan for Mr. Bonds.

21          **THE COURT:**  Good morning.  All right, this is a

22  series of motions in limine that we had to hear this morning.

23  I wanted to tell you what's on my agenda for today, and if

24  there are other -- other matters, you can mention them.  But

25  our first order of business will be the motions, and we will

talk about them.

In addition, though, there were two things I wanted to discuss with Counsel this morning. One is procedural issues with respect to selecting the jury. Because there are a few things we need to talk about now in order to get the jury process in motion.

And then the third thing I would like to talk about are some procedural questions with respect to how we'll handle the trial, and what kind of access we will give to the media and the press, should they wish to have it, during the trial, itself.

So, those -- those two procedural questions I would like to address when we have finished our first discussion of the pending motions. However, with respect to the pending motions, I would like to start with them.

I've read all of your papers, and the exhibits. I'll give you a couple of my preliminary thoughts, and then I guess it's Defendant's motion, so you can go first. And, this is sort of in my order. It's similar to, although not identical with, the order that you put them in your papers.

The first issue that I've considered is the BALCO-related lab records that include urine and blood test results. And the BALCO log sheets that reflect them. I'm not right now talking about lab results from Major League Baseball's tests. Those have different issues. But with

respect to the BALCO-related blood tests, you've discussed

numerous issues that relate to the lab records and the BALCO

records and the authentication and business record nature of

those.  But it seems to me that the main question is the

establishing of whether the blood test was that of the

Defendant or not.  That is the linchpin of all of those

records, whether or not they can be fit within some other

standard hearsay exception.

And my preliminary view is there is -- if there is

testimony to establish that the blood samples were the

Defendant's blood samples, then that's that.  If there's no

testimony to establish that, but if you rely on the other kinds

of exceptions to the hearsay rule that are discussed in the

papers, I don't think any of them works.

I don't think that 804(b)(3), the statement against

interest works; I don't think the residual exception works; and

I don't think the co-conspirator exception under 801(d)(E)

works.

So, my preliminary view is absent testimony that

would establish that establish that the blood samples were the

Defendant's blood samples, then the documentation is not hooked

up to this case.

The second big topic that I have evaluated is the

calendars seized from Mr. Anderson's residence relating to the

Defendant.  If somebody testifies about those calendars, and

1  identifies them, then I'll address that question when it

2  arises.  But if nobody testifies about them, about the ones

3  that are related to Defendant or allegedly related to

4  Defendant, I don't find that the hearsay exceptions that have

5  been urged will get them into evidence.

6           One question I have on this is that is I don't -- I

7  just don't think that the business record exception can be laid

8  out.  The statement against interest exception in this instance

9  I don't think will apply, either.

10          As a footnote to that, the Government has alluded to

11 Mr. Anderson's statement to Agent Novitsky about, "Well, it's

12 not a good idea to put my name on these things" as suggesting

13 knowledge that the conduct was illegal, and therefore would be

14 a statement against interest.  That, I think, has a

15 confrontation clause problem under *Crawford*.  And you didn't

16 mention that at all in your papers, but it seems to me that

17 that's a problem with that.

18          So, I have not seen a way that there's an exception

19 to get the calendars that relate to the Defendant in evidence,

20 barring somebody testifying about them.

21          The calendars relating to other athletes, I'm going

22 to defer ruling on that, and we'll see what testimony there is.

23 Presumably there could be testimony from other athletes about

24 those other calendars.  I don't know.

25          The handwritten notes from -- seized from BALCO and

from Mr. Anderson's residence, if there's testimony about the

notes, maybe they come in.  If there's no testimony about them,

I don't think they come in.  But, we'll see what happens with

that.

The tape-recorded statements to Steve Hoskins -- let

me ask you this, Mr. Parrella.  Do you anticipate calling

Mr. Hoskins as a witness?

**MR. PARRELLA:**  That's correct, Your Honor.

**THE COURT:**  This, I think, is a close question.  I

think the statements made by Mr. Anderson on those tapes,

assuming the tapes are properly authenticated, and identified,

and testified to, that comes very close, I think, to the

statement against interest that would make it admissible under

804(b)(3).

I did read the *Williamson* case that Defendants

pointed to.  But it seems to me that there's a Ninth Circuit

case subsequent to *Williamson*, which is *Paguio*, which reaffirms

that the test is whether the statement tends to incriminate.

It doesn't have to be an outright confession.  So, I think

those statements may well come in.  That's my preliminary view.

It appears that the Defendants have withdrawn their

motion as to Dr. Catlin's testimony.  With respect to

Dr. Bowers, I'm going to request that the Government respond in

writing to the *Daubert* analysis that was done in the reply that

the Defendant filed.  You really haven't addressed that.  And

1    I'll take that under consideration.

2            If we need a *Daubert* hearing, we can do it either

3    before trial or during trial.  I don't think that's a big

4    issue.

5            The motion with respect to lay testimony is denied

6    without prejudice.  We'll just see who's going to say what.

7    And to the extent it's not opinion testimony, then I think

8    those issues fall out.

9            So, that's where I'm starting in my evaluation.  So,

10   whoever wants to go first may do so.

11           **MR. RIORDAN:**  Your Honor, we'll wait and -- as to

12   matters which the Court has indicated that it is tentatively

13   inclined to rule in favor of the Defendant's position, we will

14   reserve comment until the Government speaks, which really

15   leaves us -- leaves me with the Hoskins tape.

16           And what I would like to say about that, Your Honor,

17   is this.  The -- the test that the Supreme Court has reiterated

18   that the Rule states is -- is a statement so clearly

19   inculpatory in terms of criminal liability that no one, no

20   reasonable person would make it if it weren't true.

21           So, we look at the circumstances of this particular

22   statement.  I do want to clarify this.  We have a very, very

23   different view, and we'll make this as an offer of proof, as to

24   how and why the statement was taken.

25           The Government says it was taken in March of 2003,

tape-recorded in the locker room at Candlestick Park.  What the

Government knows is that, involving Stevie Hoskins, is that in

June and July of 2003, before there was any hint that there was

any investigation of Mr. Bonds, he went to the Government and

said, "Stevie Hoskins, my lifelong friend is stealing from me.

He's forging documents, he's ripping me off.  I entrusted him

with the memorabilia business because he was a longtime friend,

and he's forging documents and stealing money from me."

So, and he says, Mr. Bonds says his lawyers say, "We

discovered this in spring training," which would be February or

March of 2003.

So this tape recording, in our view, has nothing do

with Mr. Hoskins' altruistic interest in Mr. Bonds, and talking

to his father, and enlisting Bobby Bonds in assisting Barry

Bonds.  What it is is an attempt by Hoskins to manipulate a

conversation so he can get some protection against the

investigation that he knows is coming for his thefts.

And when we look at the statement, the only person

who uses the word "Barry" in this statement is Mr. Hoskins.

He's attempting to get Mr. Anderson to make statements about --

about Mr. Bonds, hopeful that he can get something that he

might be able to blackmail Mr. Bonds with.

And in fact, what Mr. Anderson does in each of these

things is respond.  And the question is, if you take this

statement under Monaco (Phonetic), the Ninth Circuit standard

1  here, if you take this statement would a reasonable person

2  know, a reasonable person in Mr. Anderson's shoes know that if

3  he makes the statements he makes in here, he is open to

4  criminal prosecution.  Criminal prosecution.

5        And, there simply is no statement in here.  If the

6  Government had this statement at the time -- they didn't,

7  Mr. Hoskins only came forward with it after he was interviewed

8  by the FBI about his theft.  But if they had the statement at

9  the time, would this render Mr. Anderson subject, clearly

10 subject to criminal prosecution.  And it wouldn't.

11       I mean, if you take Mr. Anderson' statements in here,

12 and the ones the Government emphasizes, Mr. Hoskins is trying

13 to get him to talk about Mr. Bonds.  (As read) "I just never go

14 there.  I move it all over the place.  I've been giving -- I

15 learned that first do -- doing that shit 16 years ago."

16       And then a discussion of Major League Baseball's

17 testing procedures, and a discussion which I think you could

18 fairly say in context, refers to the "cream" and the "clear,"

19 which were not illegal at the time this statement was made.

20       So the question is, is a statement in a locker room,

21 a men's locker room, the sort of thing that someone making that

22 statement would say, "Gee whiz, if I talk about this shit, if I

23 talk about Major League Baseball's testing standards, if I talk

24 about moving around, I'm going to be subject to criminal

25 prosecution."

1     And Your Honor, I would submit that putting aside the

2 question of whether -- anything that he might say to Mister --

3 about Mr. Bonds, which he really didn't say, would be so

4 trustworthy, even though it doesn't involve the Defendant's --

5 Mister -- the Declarant's own interest, is what he says in here

6 the sort of thing where a reasonable person would say, "Boy, if

7 I talked to Stevie Hoskins about moving it around or Major

8 League Baseball standards, I'm going to get prosecuted."

9     I mean, I think the Government can fairly say, I

10 think an objective observer would fairly say that what

11 Mr. Anderson seems to indicate an interest in and a concern

12 about is Major League testing standards.

13     And the possibility that baseball's testing standards

14 could reveal that he -- I mentioned, the one name he mentions

15 in here is Benito, that's the one name Mr. Anderson mentions.

16 And as the Government says, Mr. Benito Santiago was in fact

17 receiving steroids from Mr. Anderson.

18     But he's concerned about Major League standards, he

19 appears to be absolutely concerned about concealing testing

20 results.  But, none of that is criminal in 2003.  And the

21 Government can't point to anything prior to 2003 that would

22 lead Mr. Anderson or anyone else to believe that they would be

23 criminally prosecuted for anything involving steroids in sports

24 at that point.

25     So, the test is a real one.  The notion is that --

1   that it's -- it's that seriousness that would mean that -- that

2   you don't need cross-examination because the cases they cite,

3   for instance, someone gives a detailed description of

4   committing a bank robbery.  Well, if you're going to give a

5   detailed description of committing a bank robbery, a reasonable

6   person would know you could be prosecuted.

7          But when you look at statements in a locker room

8   about testing in 2003, it is simply impossible to say that a

9   reasonable person -- they might fear a lot of things.  They

10  might fear embarrassment, they might fear public exposure.  But

11  they don't fear criminal liability.  And it's on that grounds

12  that we would say it does not meet the hearsay exception under

13  the declaration against penal interest.

14         There simply was not a coherent argument as to why

15  this would be against his pecuniary interest to make these

16  statements, so I assume the Government will limit itself to the

17  claim of declaration against penal interest, Your Honor.

18         Thank you.

19         **MR. NEDROW:**  Your Honor, if we may, we would like to

20  address some of the other issues.

21         **THE COURT:**  Oh, absolutely.

22         **MR. NEDROW:**  Okay.  So, would the Court prefer to

23  hear something in response to that, directly?  Or does it

24  matter to the Court?  Or, --

25         **THE COURT:**  I just want to know if in the year 2003

1  it was not illegal to distribute the "clear" and the "cream."

2          **MR. NEDROW:**  It was illegal in 2003 to distribute the

3  "clear" and the "cream."  Absolutely.  Yes.  In the indictment,

4  as we charged, the "clear" was a misbranded drug that was

5  probably an anabolic steroid.  And of course, now Congress has

6  recognized that it is an anabolic steroid.

7          It had not been through the kind of clinical trials

8  where it had -- merely been listed expressly with all the known

9  anabolic steroids such as methenolone and nandrolone and those

10  types, but it was arguably an anabolic steroid under the

11  analogue to the statute as it existed at that time.  But there

12  was an argument it might not be, and that's why in the

13  indictment we called it "a steroid-like substance."

14          It was illegal to distribute it for use in humans

15  because, of course, you can't just cook up something in a lab

16  and have it distributed and used by people in the manner in

17  which Patrick Arnold and Victor Conte and Greg and were doing.

18  And that's why we charged, ultimately, all those individuals

19  for their illegal distribution of the "clear."

20          Separately with respect to the "cream," the "cream"

21  of course had testosterone, an anabolic steroid.  It was

22  concealed within the cream, this testosterone -- heavy

23  testosterone ratio in a manner that made it difficult for drug

24  testing authorities to detect.  But it, itself, was an anabolic

25  steroid.

1          And Victor Conte pled guilty to steroid distribution

2    based upon the "cream" and other items, as did Greg Anderson.

3    So they were both illegal substances in 2003, beyond any doubt,

4    to distribute without having a doctor involved.

5          The "cream" was without any doubt, an anabolic

6    steroid.  BALCO Defendants pled guilty to it.  The "clear," had

7    the case gone to trial, Your Honor, the evidence would have

8    shown it was an anabolic steroid.

9          However, it would have -- it would not be candid to

10   say there isn't -- there wasn't at least some legal argument as

11   to whether -- there was an expert saying things like -- does it

12   really have steroid-like effect, and things of that sort.

13         And that's why, again, we were clear -- clear in our

14   indictment to say that the "clear" is a steroid-like item, as

15   opposed to just coming out and saying it's a steroid.

16         **THE COURT:**  Thank you.

17         **MR. NEDROW:**  Thank Your Honor.  Well if I may, Your

18   Honor, since I'm here -- and again, I don't want to jump topics

19   too -- Mr. Finigan is going to respond to Mr. Riordan's

20   argument.  But I'd like to, if I could, be heard on the

21   documents found at BALCO.

22         **THE COURT:**  Sure.

23         **MR. NEDROW:**  There's no question that these test

24   results are from legitimate labs, that the Government wants to

25   introduce.

1        **THE COURT:**  I think the only question is the link.

2   Whose blood is it.

3        **MR. NEDROW:**  Thank you, Your Honor.  Yes.  I'll go

4   straight to that.

5        **THE COURT:**  You don't need to talk about the rest of

6   it.  I don't necessarily disagree with you on the rest of it,

7   but I find that to be the insuperable problem.

8        **MR. NEDROW:**  Understood, Your Honor.  Then I think

9   what I would like to address -- and I appreciate the

10  guidance -- is to go to the log sheet which was in the defense

11  exhibits -- Your Honor, it's Bates-stamped 114, and it's just

12  under 2B.  I have it right here, if I can --

13       **THE COURT:**  I got it.  I have it.

14       **MR. NEDROW:**  Okay.  Okay, thank you.

15       Your Honor, the Government is going to call the

16  vice-president at the time of BALCO, James Valente.  The Court

17  may recall he pled guilty for his known involvement in being

18  involved and distributing the drugs through BALCO.

19       And Mr. Valente's testimony and the offer of proof we

20  would make is that he's going to testify, "It was one of my

21  jobs at BALCO to keep records."

22       And, he's going to identify this document

23  (Indicating), and actually it's a five-page document, 114

24  through 118, as a log he kept in his duties at BALCO to monitor

25  circumstances where he was sending out samples, urine samples

1  to the labs, Quest (Phonetic), to get them checked to see

2  whether or not they were detectible for steroids.

3          His testimony, we believe -- and we would ask the

4  Court to at least defer ruling until he testifies -- as a

5  records custodian is going to really fit, just check the box

6  all the way down on 803-6.  He's going to say, "I personally

7  made these entries in my normal course of duties, based on

8  information known to me, and based upon my day-to-day

9  responsibilities at BALCO."

10          **THE COURT:**  How did he get the information that was

11  known to him?

12          **MR. NEDROW:**  Your Honor, I understand.  And, he is

13  going to say the reason, at least as to Mr. Bonds -- and I

14  don't know about all the other athletes -- but as to Mr. Bonds,

15  he's going to say, "Greg Anderson, on a regular basis, would

16  come in and give me samples."  And he'll say that "I knew these

17  were Barry Bonds' samples because Greg Anderson told me."

18          And, I understand why the defense argument that's

19  hearsay has a surface appeal, because the Government is not

20  going to offer prove that James Valente or anybody else was in

21  the room when Mr. Anderson collected his samples of Mr. Bonds.

22  The Government does not have that evidence.  Understood.

23          What I ask the Court to consider and think about is

24  really this kind of normal business-records type application

25  that the Court sees every day, in which a person comes in from

1  Microsoft -- not to pick on Microsoft, but a company where they

2  say, "Yes, here's records showing our shipments coming in from,

3  say, China or Canada, and this is our regular shipping log.

4  And on a regular basis what we do is we get boxes in from

5  Canada, and we enter as a part of our regular course of duties

6  a box coming in, this one says it came from China.  I know it

7  to be the case from working at Microsoft that things come from

8  China.  And then we weigh it, and we log it, and it goes to the

9  place where they sell the boxes or the computers."

10          And the reason I illustrate that, Your Honor, is that

11  person isn't in the shipping dock, that person isn't

12  knowledgeable of getting things from China, and bringing them

13  over from China and putting them into the Microsoft shipping

14  dock until it goes further.  That person is testifying based on

15  their knowledge and their experience working at the company,

16  and their knowledge of the way that that's the way things work

17  at their company.

18          And frankly, I think Mr. Valente's level of knowledge

19  exceeds that here.  What he's going to say is "I knew Greg

20  Anderson as a person who is associated with Mr. Bonds.

21  Mr. Anderson would come in on a regular basis, comments to me

22  like, 'Yeah, this is on behalf of Barry,' or 'I knew him to be

23  associated with Barry.'"

24          He would give him the sample, Mr. Valente would enter

25  it and assign it a donor number (Indicating) or a -- you know,

1 a code number.  He would then, per his normal course of

2 business, which is logged on here, personally be involved in

3 sending the sample off to Quest.

4         **THE COURT:**  And what's the exception that gets you

5 Mr. Anderson's statement into evidence?

6         **MR. NEDROW:**  Well, Your Honor, the statement of

7 Mr. Anderson, I understand -- and we've made the arguments and

8 I understand the Court's considered them -- we would do think

9 it qualifies under the co-conspirator exception and the

10 statement against penal interest and things of that sort.

11         But, I guess what I would ask the Court to consider

12 is the Government doesn't need to have Mr. Valente testify

13 "Mr. Anderson told me these things."  It could be that his

14 testimony is, as he discusses this sheet (Indicating) and again

15 just as a regular business records custodian, that Mr. Anderson

16 says, "Right, I personally completed this document based upon

17 my daily responsibilities at BALCO" --

18         **THE COURT:**  But the document's only relevant if they

19 were testing the Defendant's blood.  And urine.  Right?

20         **MR. NEDROW:**  Ye- -- Your Honor, I would agree that it

21 needs to be -- it needs to show some relevance to Mr. Bonds for

22 it to matter in this case.  Yes.  I agree with that, yes,

23 that's right.

24         **THE COURT:**  So I still need to get some explanation

25 for how I'm allowed to rely on the out-of-court, non-sworn

1  statement of a non-testifying witness in evidence.  That's

2  hearsay.  That's classic hearsay.  So you need to give me some

3  way that I can let that into evidence.

4      **MR. NEDROW:**  Your Honor, you know, again we have made

5  the arguments that we have made.  There is one other exception

6  that frankly we haven't briefed extensively in the brief but I

7  would like to raise it and if the Court would like maybe a

8  brief supplement on it, we will put it in.

9      And there is another exception under 801(d)(2) --

10  actually there are two of them, 801(d)(2)(C) and 801(d)(2)(D)

11  as in David, where Mr. Anderson's statement I think qualifies

12  under both of those as admissions by a party opponent.  And the

13  way it would come about is it's a statement by a person

14  authorized by the party to make a statement concerning the

15  subject.

16      **THE COURT:**  How do we get proof that he was

17  authorized by the Defendant to make the statement to

18  Mr. Valente?

19      **MR. NEDROW:**  Your Honor, Mr. Bonds --

20      **THE COURT:**  Because he says so?

21      **MR. NEDROW:**  I'm sorry, Your Honor?

22      **THE COURT:**  Because he says so?  I mean, then you're

23  back in the same old soup.

24      **MR. NEDROW:**  No, I understand, and again, I'm sorry,

25  we really should have flagged this particular angle a little

1 bit earlier, but Your Honor, Mr. Bonds in his grand jury

2 testimony, under oath, says he provided samples to

3 Mr. Anderson, and that he knew that those samples were going to

4 be given to BALCO, and he knew that something was going on.

5        He kind of trails off at that point, Mr. Bonds does,

6 as to what was going to be done with them. But he specifically

7 says -- and we can submit something with the parts of the grand

8 jury transcript that highlight this -- "I knew that the samples

9 that I was giving to Mr. Anderson were going to BALCO."

10        And we think that's pretty career in terms of

11 Mr. Bonds saying he authorized -- and that's what the language

12 is in the Rule -- Mr. Anderson to provide the samples to BALCO.

13 And it would seem, given that's the link for Mr. Anderson --

14 not only would matter to BALCO, to Mr. Bonds, because

15 Mr. Anderson's communicating information, this is Mr. Bonds'

16 sample, that he's authorizing representation to be made to

17 BALCO.

18        I would also ask the Court to consider again

19 subsection D, because that's the segment that says (As read) "A

20 statement by the party's agent or servant concerning a matter

21 within the scope of the agency or employment made during the

22 existence of the relationship," and I think that applies as

23 well.

24        It's pretty clear that Mr. Anderson and Mr. Bonds had

25 a professional relationship, and that Mr. Anderson worked for

1   Mr. Bonds essentially as his trainer, and of course, the

2   Government's argument is as his steroid supplier.  And

3   Mr. Anderson, as a part of his work responsibilities for

4   Mr. Bonds, was going through this testing practice to help

5   Mr. Bonds make sure that his urine didn't come up with a

6   positive test result.

7            So, again, (d)(2)(C) and (d)(2)(D) we really think

8   are on point with respect to at least this statement by Mr.

9   Anderson, saying, "Yeah, these urine samples belong Barry

10  Bonds," being a part of that chain.  And then once you're

11  there, we think both the log sheets and the other test results

12  should be admissible.

13           One other point we would like to make, Your Honor,

14  obviously the defense can and will be free to argue at trial

15  that just Anderson's representations don't prove somehow that

16  they're Barry Bonds' urine.

17           In other words, again, the Government doesn't have

18  proof that anybody was there with Mr. Bonds when these samples

19  are being provided.  That's an argument that goes to the weight

20  of things at trial.  And they'll have the ability to argue that

21  at trial.

22           But in terms of admitting it, and having it get over

23  the threshold for reliability and trustworthiness, it's

24  necessary to have it admitted.  We think that, you know, the

25  basis I've just outlined meets the test.

1            **THE COURT:**  Thank you.

2            **MR. NEDROW:**  So, thank you.  I'll keep my comments

3  briefer on the calendars and the handwritten notes, except to

4  say we believe that these statements on the calendars and the

5  notes are a part both of this ongoing conspiracy to distribute

6  steroids and statements against penal interest.

7            There's actually no doubt they're statements in

8  furtherance of a conspiracy to distribute steroids, and the

9  issue of course is whether Mr. Bonds was a part of the

10 conspiracy.  And we understand that's -- you know, some -- it's

11 arguable because certainly we're not saying Mr. Bonds is

12 involved in distributing steroids.

13           But it was in the original indictment that the

14 athletes --

15           **THE COURT:**  BALCO indictment?

16           **MR. NEDROW:**  I'm sorry, Your Honor, yes, in the

17 original BALCO indictment, yes, yes, it was.  And it's actually

18 in Count 8, it's the conspiracy regarding misbranding.  It was

19 in the original BALCO indictment that athletes were provided

20 cover stories and were told to keep things secret.  And I think

21 from that, the inference that one could very reasonably draw is

22 that Mr. Bonds' role as a prominent athlete in this, who was

23 allowing his urine to be tested and was participating in

24 keeping his secret puts him, you know, squarely in the middle

25 of the conspiracy.

1      And with that in mind, we think that the statements

2  should be admissible under that theory as well.  I also think

3  under the admissions theory I've just laid out under 801, with

4  respect to again maybe not the authorization part, but the

5  agency part, again Mr. Anderson is essentially working for

6  Mr. Bonds.

7      And what Mr. Anderson is doing is he's creating

8  calendars so that he can work with Mr. Bonds in both monitoring

9  the steroids he's distributing to him and also Mr. Bonds' usage

10 of them.

11     And under that theory, as an agent or employee or --

12 "servant" is the word they use, kind of an outdated word,

13 Mr. Anderson really is entering admissions that are on behalf

14 of Mr. Bonds.  And I do think that the calendars and the notes

15 may be a little more attenuated, but I think that they can all

16 be considered as admissions under those theories, as well.

17     So again, we would respectfully ask the Court to

18 consider that theory as well.

19     I'll be brief on the expert comment, and I would like

20 to defer to Mr. Finigan.  He's going to address, again,

21 Mr. Riordan's argument.

22     But with regard to the experts, obviously, these two

23 individuals are among the top people in the world in terms of

24 drug testing.

25     So, the Government is pretty confident we'll be able

1 to demonstrate and get past any *Daubert* threshold the Court has

2 concerns about. And if tested, by his experts before Your

3 Honor before, as Your Honor is aware. So, we'll be happy to

4 schedule that and make that showing at the Court's direction.

5          And with that, I appreciate it very much. Thank you,

6 Your Honor.

7          And again, Mr. Finigan is now going to address the

8 tape issue.

9          **THE COURT:** Thank you.

10          **MR. NEDROW:** Thank you very much.

11          **MR. FINIGAN:** Good morning, Your Honor.

12          **THE COURT:** Good morning.

13          **MR. FINIGAN:** Your Honor, first, just a couple of

14 points on the tape. I think -- first of all, I don't believe

15 Mr. Riordan really said anything that was different than what

16 was in their papers, and should really cause Your Honor to

17 decide any differently than you have indicated.

18          The two small points are that first of all, with

19 respect to why Mr. Hoskins made the tape, again, that's purely

20 cross-examination that goes to the weight of the evidence.

21          The second point is that what -- what the defense is

22 really focusing on is that in that tape --

23          **THE COURT:** May I just interrupt you on one point?

24          In evaluating the tape, I relied on the accuracy of

25 what you put in your papers, and what they put in theirs. And

1  I'm assuming it all comes in more or less that way when

2  Mr. Hoskins testifies.

3        If there was any suggestion that Mr. Hoskins did the

4  tape recording in order to investigate on behalf of the

5  Government, or in order to investigate for purposes of a

6  prosecution, then I would have a different view, because then

7  it would be testimonial, and then you would run into *Crawford*.

8  So I'm assuming it was not that kind of a situation.

9        **MR. FINIGAN:**  You are correct, the Government has

10  zero involvement in this tape recording.

11        **THE COURT:**  That's what I was assuming.

12        **MR. FINIGAN:**  Yes.

13        **THE COURT:**  What Mr. Riordan said, I don't know

14  what -- the timing of all that gave me some pause.  If there

15  was some suggestion that Mr. Hoskins was working for the

16  Government or with an eye toward Government prosecution, that

17  would color my thinking.

18        **MR. FINIGAN:**  Understood.  And how I understood

19  Mr. Riordan's argument, if he is arguing that Mr. Hoskins was

20  working for the Government, that's just wrong.  There's no

21  evidence of it.

22        What I understand Mr. Riordan to be saying is that

23  Mr. Hoskins was doing it in order to blackmail the Defendant.

24        **THE COURT:**  That is a different point.

25        **MR. FINIGAN:**  Exactly.  That's a different issue.

1 | With respect to what I perceive to be the thrust of the defense

2 | argument which is, well, you cannot look at these statements

3 | and say that Greg Anderson is admitting to a particular crime,

4 | I think as Your Honor has noted that is not what needs to be

5 | shown, and you have focused properly on the fact that it just

6 | need to tend to show that the Defendant is subject to that.

7 | And you've pointed out that there's Ninth Circuit authority

8 | later in time than *Williamson*.  All I want to do is point out

9 | that *Williamson* itself, Your Honor, contemplates that these are

10 | the types of statements that can come in, specifically at Page

11 | 2436 and 2437, the Court in *Williamson* points out that even

12 | statements that are on their face neutral may actually be

13 | against the declarant's interest, and then it gives two

14 | examples.

15 | One, this is at the top of Page 2437, Your Honor (As

16 | read), "'I hid the gun in Joe's apartment' may not be a

17 | confession of a crime, but if it is likely to help the police

18 | find the murder weapon, then it is certainly self-inculpatory."

19 | Secondly, the next example, "'Sam and I went to Joe's

20 | house' might be against the declarant's interest if a

21 | reasonable person in the declarant's shoes would realize that

22 | being linked to Joe and Sam would implicate the declarant in

23 | Joe and Sam's conspiracy."

24 | And that's exactly what we have here.  We have

25 | statements by the Defendant -- or excuse me, by Mr. Anderson on

1  the tape, that clearly when put together in the context of the

2  facts of the case subject him to or inculpatory -- inculpating

3  with respect to Mr. Anderson and against his penal interests.

4  So, those are my comments on the tape, Your Honor.

5          And I think that that fits in with the log sheets as

6  well, which is what I want to comment on as well.  And with

7  respect to the log sheets, Your Honor, I think if the -- the

8  statements that Mr. Anderson makes on the tape come in, then

9  the statements about the log sheet absolutely come in under the

10 same theory.

11         Again, he is simply saying, "This is Barry's urine,"

12 or something, words to that affect.  Again, on their face,

13 maybe not something that subjects somebody to criminal

14 prosecution.  But as *Williamson* says, and as the other

15 authorities that we have cited say, if you put that together

16 with the other facts that you have, does that subject the

17 Defendant to criminal prosecution?

18         And it absolutely does, because what Mr. Anderson and

19 the other -- the employees of BALCO and the Defendant were

20 doing were administering an undetectible substance, and they

21 were running clients' -- not just the Defendant's but lots of

22 their clients' urine and blood through testing, through BALCO,

23 to make sure that their substances could not be detected.

24         And he would have known, any reasonable person would

25 have known at that time that that could subject him to criminal

prosecution. Indeed, it did. He was prosecuted, and he pled

guilty. So, I think that the statements are the same -- the

analysis is the same with respect to the tape, and the

statements underlying the log sheet.

Putting the tape aside, Your Honor, with respect to

the log sheet, I think it's telling that the defense has never

argued that Mr. Anderson's statement is untrue. They've never

argued that. It's simply that we technically can't fit it in

under hearsay exception. And the hearsay exceptions that we

have given to Your Honor, argued to Your Honor, they all really

relate back to trustworthiness. And indicia of reliability.

And the Court absolutely has that with respect to the very

simple statement of Mr. Anderson passing a urine sample to

Mr. Valente and saying, "This is Barry's urine."

*Idaho v. Wright* talks about two examples, which is

does a person have a motive to make that statement up, or is it

the type of statement that you would expect that person to make

up? And obviously, the answer to either of those is no.

There's no reason for Greg Anderson to lie that that is

Mr. Bonds's urine sample. There's no reason for Mr. Anderson

to make up that that was Barry Bonds's urine sample. That was

his job. He was working for Mr. Bonds. And part of his job

for Mr. Bonds was to submit his urine, to make sure that it

wasn't showing the presence of any of the substances that he

was giving to him. There's absolutely no reason to disbelieve

1  that statement.

2          And when you look at the other evidence, Your Honor,

3  it's really -- again, this sort of goes to the weight.  And

4  proving that the samples belong to Mr. Bonds is a

5  circumstantial process, Your Honor.  But it's no different than

6  any other case.  You have the Defendant again admitting in his

7  grand jury testimony, which if Your Honor wants to review, I

8  think about Page 18 through 20, where the Defendant

9  specifically admits, "Yeah, I gave urine to Anderson,

10  approximately four times.  And I knew he was taking it to

11  BALCO.  My doctor, Dr. Ting, withdrew my blood multiple times,

12  and I knew he was giving it to BALCO."

13          So you've got the most important piece of evidence in

14  a circumstantial case, Your Honor.  You've got the Defendant

15  admitting "I gave these samples to BALCO."  Really, what else

16  do you need?  But you have Dr. Ting confirming that, "Yes, I

17  did draw the Defendant's blood, and I did give it to BALCO on

18  occasion".  And you've got Mr. Anderson making that statement.

19          I understand that's the hearsay statement, and that's

20  the issue, Your Honor.  But when you look at the exceptions and

21  you look at what they tie back to, which is the

22  trustworthiness, as you sit there and look at the evidence, I

23  think the question for Your Honor really is, do you have any

24  reason to disbelieve this statement.  Is there any reason that

25  I should find this statement not to be not trustworthy.

1    **THE COURT:**  Well, that's not really the question.

2  The question is, under the Rules of Evidence, does it come in.

3  That's the question.

4         I'm going to apply the Rules of Evidence to this

5  case.  You know, whether it's true or not, I don't know.  But

6  I'm applying the Rules of Evidence to this case, not thinking

7  about whether it was probably true, because that's not the test

8  I'm required to apply.

9    **MR. FINIGAN:**  Very well.  And the rules of evidence

10  are, with respect to the statement against interest, again as

11  I've already pointed out, saying that that was Mr. Bonds's

12  urine is against his interest, for the same reason the

13  statements in the tape are.

14         With respect to the residual exception, what that

15  really ties back to is in looking at the statement, do these

16  circumstances surrounding that statement indicate it was

17  trustworthy?  And looking at it in that framework -- which is

18  similar to evaluating whether it's true, but I understand your

19  point -- looking at it in that framework, is that statement

20  trustworthy, was there a motive for Mr. Anderson to make it up?

21  No.

22         By all means, he had every motive to make sure he was

23  accurate, because he wants to see what the results are of

24  Mister -- of the Defendant's urine test, and of the Defendant's

25  blood test.  And he wants to accurately communicate those.

1 Either he wants to know those so he can adjust what he's doing,

2 or he needs to activity communicate those later on to his

3 client.  So there was no motive.

4 And when you look at the corroboration that we've

5 already gone through, I think all of that shows that the

6 statement qualifies, under the residual exception.  It

7 qualifies under the Rules of Evidence, Your Honor.

8 And the thing that I would point out with respect to

9 the residual exception is *Valdez Soto* (Phonetic) specifically

10 says, and I know the defense has indicated that we need unique

11 circumstances, that you must read this rule narrowly, and in

12 support of that they offer a, quote, history lesson, and a

13 Fifth Circuit case from the 1960s.  *Valdez Soto* specifically

14 rejected the same argument.

15 In that case, the defense argued that the Court

16 should interpret 807 narrowly by looking at its legislative

17 history.  And they specifically said, "We're not going to do

18 that," Your Honor.  That's at Page 1471 of *Valdez Soto*.

19 And what the Court just says is that (As read) "Rule

20 80324" -- which was the precursor to 807, Your Honor -- "exists

21 to provide courts with flexability in admitting statements

22 traditionally regarded as hearsay, but not falling within any

23 of the conventional exceptions."

24 So if for some reason Your Honor should find that

25 Mr. Anderson' statement doesn't fall within the co-conspirator

1  exception or within 801(e) or (d)(2), or within the statement

2  against penal interest, it does fall within the residual

3  exception based on the authorities that we have cited, and for

4  the reasons and the facts that we have cited to the Court.

5          **THE COURT:**  Well, *Valdez Soto*, wasn't --

6          (The Court examines document)

7          **THE COURT:**  *Valdez Soto*, the declarant testified at

8  trial.

9          **MR. FINIGAN:**  He did, Your Honor.  But he was

10 testifying about testimonial statements, which Mr. Anderson's

11 statement is not, under *Crawford*.  So that's a significant

12 distinction.

13         Mr. Anderson' statement, "This is Mr. Bonds's urine"

14 to James Valente is not testimonial.  It's not in court, it's

15 not sworn, it's not to law enforcement.  *Crawford* doesn't apply

16 to that, Your Honor.

17         So, the reasoning of *Valdez Soto* applies.  And,

18 even -- even if you were to find that, Your Honor, what *Valdez*

19 *Soto* is just talking about in general is how to interpret the

20 residual exception, which is that it's not a narrow

21 interpretation so that the rule is never used.  The rule is

22 there for a reason, to be used.  And these are the

23 circumstances.

24         We don't believe that highly unique or exceptional

25 circumstances are required.  But even if they are required,

1  they are certainly present here, Your Honor.  When you look at

2  the situation here, where a witness, Mr. Anderson, who's been

3  immunized, has chosen to spend over a year in jail rather than

4  simply tell the truth about what he knows, that's a unique

5  circumstance, Your Honor.  And he is not somebody that the

6  Government's hiding or he's taken off, he simply doesn't want

7  to testify because of his link to the Defendant.  And that's

8  significant.

9          **THE COURT:**  Okay.  Thank you.  Mr. Riordan?

10          **MR. RIORDAN:**  Your Honor, one preliminary remark.  We

11  have been briefing this for a month.  The Court has a hundred

12  pages of briefing in front of it.  The Government has just

13  gotten up and talked about hearsay exceptions that cannot be

14  found anywhere in that hundred pages.

15          The Court should rule on the things briefed before

16  it.  And the Government, if it has something other to say,

17  that's for another day.

18          But it's just outrageous to get up here after all

19  this briefing, and start citing sections that it didn't think

20  to cite in a hundred pages.  At a minimum, it's an admission of

21  incompetence.  But it simply -- it's not the way things are

22  done.  If this was an appeal, the Appellate Court would rule it

23  out of hand, for not being in the briefing.  So, let's decide

24  the issues that are briefed, and anything else is for another

25  day.

1    We've just heard about the residual exception.  The

2  Government has cited four cases.  Two of them involve

3  situations where the -- the opposing party had

4  cross-examination available.  *Valdez Soto*, the guy is on the

5  stand.  All right?  If Mr. Anderson is on the stand here, it's

6  a new day in terms of admissibility and everything else.  It's

7  just absolute nonsense to say a situation in which someone can

8  be cross-examined fully, and they apply the residual exception,

9  is comparable to a situation where they're proposing to base a

10 case -- their entire case, and a case where somebody's liberty

11 is at stake -- on out-of-court hearsay statement.

12    If this Court finds that the jury relied on an

13 out-of-court statement that wasn't cross-examined, it tosses a

14 conviction immediately.  *Valdez Soto* has nothing do with this

15 case.

16    The second case, *Sanchez Lima* (Phonetic), is a case

17 in which the Government had the opportunity -- these were

18 tape-recorded, photographed, videotaped statements.  The jury

19 could observe the demeanor.  The Government had the opportunity

20 to participate in the cross examination, and declined to do so.

21 That's got nothing to do with our situation here.

22    The other two cases are cases where, quite

23 unremarkably, very reliable documents from foreign governments

24 or associations were offered, and the Court simply said there's

25 absolutely no reason to doubt the bills of lading or the

1  customs declarations here, you don't need to bring people in

2  from Chile and Thailand in order to do it.

3         So, there is nothing comparable under the residual

4  exception.  There is nothing comparable to the denial of

5  confrontation or cross-examination that the Government proposes

6  here.

7         On the issue of -- oh, we just had a discussion of

8  the Hoskins statement, and the Government got up here and

9  admitted that the "cream" and the "clear" were legislated into

10  the illegal steroids list subsequent to these events.

11         So, there is -- you know, it's preposterous to

12  suggest that you could evoke the *ex post facto* clause and

13  prosecute --

14         **THE COURT:**  I heard Mr. Nedrow say something quite

15  different.  I heard him say that one of them was testosterone,

16  which is always there as an anabolic steroid, and the other one

17  was dicier.

18         **MR. RIORDAN:**  Well, I'll examine his remarks.  But I

19  don't think that there's any question that there was a

20  legislative enactment after this time.

21         But the critical point here is whether a reasonable

22  person in 2003 believed that criminal prosecutions could be

23  based on the statements here.  And, what we're getting at is

24  that if there's a clear statement of liability, then the -- the

25  need for cross-examination is lifted.

1          Take a statement like this: "I move it all over the

2    place."  Is that a statement that Anderson should be

3    cross-examined -- what is he talking about?  And who is he

4    talking about?

5          He then goes on and discusses the "cream" and the

6    "clear."  Who is he talking about here?  Is he talking about

7    Santiago?  Who is he talking about on the Giants?  This is a

8    case where this statement cries out for cross-examination.

9          And the final thing is he's saying this is all

10   undetectable.  What is his subjective state of mind?  I'm not

11   exposing myself to criminal liability in this situation at all.

12          Plus, the fact that we're talking about a statement

13   made in a men's locker room.  And there is no greater pit of

14   mendacity in the world than a men's locker room.

15          So, it simply doesn't have the clarity of liability

16   that's required, because we're talking about an adequate

17   substitution for cross-examination.  The Court would be saying

18   that what this statement means is so clear that Greg Anderson

19   need not be here to explain it.  If he is, you know, then the

20   residual exception or whatever is a different ball game.

21          So Your Honor, we urge you to rule on the basis of

22   the arguments made.  I think the Court has made tentative

23   rulings on them, and we -- we think we have made a compelling

24   argument on the Hoskins tape.

25          I would ask for the Court's indulgence to consult for

1  a second with my Co-counsel.

2          **THE COURT:**  Of course.

3          (Off-the-Record discussion).

4          **MR. RUBY:**  Your Honor, if the Court please,

5  Mr. Riordan pointed out, and I share his view, that this new

6  argument, the one that we have never seen before -- I mean, I

7  don't want to use any harsh language, but fair is fair.

8          I mean, we've all known this is pretty important.

9  And if the Government had an afterthought, somebody could have

10  called me this morning and said, "Why don't you take a look at

11  your Evidence Code." So -- but with the Court's indulgence, I

12  can't let it just hang here.

13          And these two sections that they're talking about,

14  801(d)(2)(C) and (D), they're agency sections.  And there's no

15  evidence, Mr. Bonds never said that Mr. Anderson was anything

16  other than his trainer.  What the Government is doing, I think

17  it's obvious, is a big circle.

18          Well, if you start with the proposition that

19  Mr. Anderson was a supplier -- I think that was the

20  expression -- of steroids, if you start there and work back,

21  you can construct an agency arrangement.  Well, maybe you can,

22  maybe you can't.  But I don't think the Rules of Evidence allow

23  that.

24          Secondly, Your Honor, Mr. Bonds' testimony at the

25  Grand Jury does not even come within the same time zone as

suggesting that Mr. Anderson was an agent for purposes that the Government wants to make him an agent of now. He was his trainer. I mean, that's what he said at the grand jury.

And finally on this point, if I may, Your Honor, the -- the Government says that well, while Mr. Bonds' testimony was pretty vague on this point, okay, we can agree on that, he was at the grand jury. Who was asking the questions that got the vague answers?

If the Government had these BALCO records at the time of the grand jury, if this is was of interest to the Government, if the Government was interested in trying to establish some kind of agency, there was Mr. Bonds -- actually, I've never been in a grand jury room, I don't know where Mr. Bonds was.

But Mr. Bonds was testifying, the Government was getting to ask questions. They didn't ask questions that laid any kind of foundation for a hearsay exception. And now they say, "Well, he gave vague testimony, but if you hold it up to the light a certain way, it's an exception."

And so once you get past -- if you get past the idea we're hearing this for the first time, it doesn't fit.

Thank you.

**THE COURT:** Thank you.

**MR. NEDROW:** If I may, briefly, Your Honor?

**THE COURT:** Sure.

1          **MR. NEDROW:**  If I may briefly, this is a procedural

2     matter here.  Your Honor, it's a month before, the trial and

3     you know what?  They're right.  And I apologize.

4          We didn't see the argument, and frankly, it came up

5     to us yesterday afternoon on this idea of (C) and (D), and you

6     know, I agree, fair is fair.  They ought to be able to respond

7     to it.

8          With that said, fair is fair.  It's a month before

9     trial, Your Honor.  We're not in the Ninth Circuit, we are in

10    an ongoing fluid thing.  And I'll be very surprised if this is

11    the last time somebody seeks leave to make a request of the

12    Court.  So my request respectfully would be, we be permitted

13    and we will take a page limit, we will file at any time, they

14    can have weeks they can have a month to respond to it.  We

15    would ask leave of the Court, please, to file a brief addendum

16    on this theory --

17          **THE COURT:**  When do you want to file it.

18          **MR. NEDROW:**  We can file it any time, file it

19    tomorrow, we will file it Monday, whatever.

20          **THE COURT:**  File it Monday.

21          **MR. NEDROW:**  Yes.

22          **THE COURT:**  And if you want to respond in writing you

23    may do so by Friday, okay.

24          **MR. RUBY:**  Sure.

25          **MR. NEDROW:**  I very much appreciate that.  Thank you,

1  Your Honor.  The pots other matter Your Honor is just the Court

2  is right and the defense us just deed wrong on their discussion

3  of the "cream" and the "clear" in 2003 and the Court had that

4  right.  And then I don't want to cut off Mr. Cassman, but Mr.,

5  ckck , if the Court wants to hear further argument on the tape

6  issue, I don't know if the Court did or not --

7            **THE COURT:**  I thought Mr. Parrella -- Mr. Finigan did

8  that.

9            **MR. FINIGAN:**  I did, Your Honor.  Did you have any

10  questions based on Mister --

11            **THE COURT:**  No.

12            **MR. NEDROW:**  Then that's fine.  Thank you,

13  Your Honor.

14            **THE COURT:**  Mr. Cassman.

15            **MR. CASSMAN:**  Expert testimony, Your Honor.  Just

16  briefly.

17            **THE COURT:**  Oh.

18            **MR. CASSMAN:**  We would urge the Court to have a

19  *Daubert* hearing before trial.  We think the issues --

20            **THE COURT:**  We're not talking about Doctor --

21            **MR. CASSMAN:**  Catlin.

22            **THE COURT:**  Catlin.

23            **MR. CASSMAN:**  Well, we don't withdraw our objection.

24  We understood the Government to have said that they were not

25  going to present him with testimony concerning side effects of

1  the substance --

2      **THE COURT:**  Right, they were just going to do the

3  testing.

4      **MR. CASSMAN:**  Testing.  If that's true, then there's

5  no objection.

6      With regard to Bowers, what we understood from the

7  Government's papers is they're seeking to admit testimony about

8  the side effects of steroids only, no other substances.  And

9  then you look at Dr. Bowers' declaration, he submits

10  information concerning testosterone, only.

11      The most objectionable parts -- and I want to

12  crystallize this for the Court -- are with regard to side

13  effects of acne, and what they refer to as testicular

14  shrinkage.

15      These issues are going to be presented, if at all,

16  through one or two lay witnesses, with observations that are

17  subjective.  Not doctors, not measurements, not any objective

18  circumstance, at all.  And it will be a circus, and a sideshow.

19  And we would be required to call witnesses to rebut those --

20  those observations.

21      So, we think it behooves the Court and Counsel to

22  have the issue addressed before trial, to find out if they do

23  have any scientific evidence that would pass muster under

24  *Daubert*, and put the issues aside.

25      **THE COURT:**  What I heard Mr. Finigan or somebody or

1  Mr. Nedrow say is that that's fine, if we want to have a

2  *Daubert* hearing.  So, how would you like to handle that?

3          **MR. CASSMAN:**  We can pick a date before trial,

4  anything that's convenient to the Court and Counsel.

5          **THE COURT:**  All right.  Because what I was thinking

6  was this, that your main *Daubert* argument focusing on not

7  Dr. Catlin --

8          **MR. CASSMAN:**  Bowers.

9          **THE COURT:**  -- Bowers, came in your reply.  So what I

10  thought was we should probably give them an opportunity to

11  write anything down they want to concerning the *Daubert* issues

12  on Bowers, and then we'll just have a hearing.

13          **MR. CASSMAN:**  Okay.

14          **THE COURT:**  So, how long will it take --

15          **MR. CASSMAN:**  What I would urge is that they be

16  required to make a proffer of evidence that they would present

17  to pass muster on *Daubert* in their papers.

18          **MR. NEDROW:**  If I may, Your Honor, we have no

19  objection to that, actually.

20          **THE COURT:**  Okay.

21          **MR. NEDROW:**  What we thought was, we actually think,

22  if -- and I think Mr. Cassman is in agreement -- we can provide

23  a written document that actually may obviate the need to have a

24  *Daubert* hearing, by addressing these concerns.

25          So what we would propose, if it's okay, is we submit

1  that in writing.  And we'll probably argue there's no need for

2  a hearing.  Of course the defense can respond, and the Court

3  can decide.

4         **THE COURT:**  That would be fine.

5         **MR. CASSMAN:**  We anticipate we will need a hearing.

6         **THE COURT:**  All right.  So, how long will it take you

7  to do that?

8         **MR. NEDROW:**  If I may, very briefly, Your Honor.

9  Would next Friday be acceptable?

10         **THE COURT:**  That's fine.  So they will file that by

11  next Friday.  Then you can -- next Friday would be the 13th?

12         **MR. NEDROW:**  Yes, the 13th.  Yes, thank you.

13         **THE COURT:**  So if you could respond by, say, the

14  following Wednesday.

15         **MR. CASSMAN:**  That's fine.

16         **THE COURT:**  With either cetera a written oppo or a

17  statement of how come we definitely need a hearing, or whatever

18  you want to say.  At that point, when I get that, I'll decide

19  whether we need to have a formal hearing.

20         Will that work?

21         **MR. CASSMAN:**  That's fine.

22         **THE COURT:**  Okay.  Great.

23         **MR. NEDROW:**  Thank you, Your Honor.

24         **THE COURT:**  Okay.  Anybody else on the first set of

25  questions, which is the pending motions?

1          Okay.  The second thing I wanted to talk to you about

2   is the -- well, let's do the jury questions first.  Mr. Weir is

3   here.  He's the Jury Commissioner, and I have been speaking

4   with him about selecting the jury.

5          Our tentative plan is as follows, that we need, we

6   think,-- well, we will have to decide how many alternates we

7   need.

8          **THE COURT:**  And in part that depends on how long the

9   trial is.  And, and the bottom line of what I'm about to say is

10  I want to time-screen the potential jurors in advance of the

11  trial so that we don't have to time-screen them that morning.

12         So, how long do you think the trial is going to take?

13         **MR. PARRELLA:**  Your Honor, I think, I think the

14  Government case, about two weeks.

15         **THE COURT:**  Okay.  How long do you think, if you

16  know, you might add to that?

17         **MR. RUBY:**  If the Government's case is -- a four-day

18  week, if the Government's case is eight days, I don't think our

19  case will take more than a week after that.

20         **THE COURT:**  Okay, so three weeks, roughly, for

21  testimony.

22         **MR. RUBY:**  Based on their estimate.

23         **THE COURT:**  Okay.  That's kind of what I was thinking

24  as well.  And we want to err on the side of caution in terms of

25  having the jury available, so maybe we'll just tell them four

1 weeks, they should plan on a four-week trial.

2       So, Mr. Weir is going to send out notices to

3 potential jurors, just saying that we're time-screening to see

4 if they're available for a four-week trial.  They will not say

5 what trial it is, or with whom it is being held, just that it's

6 a four-week trial.  And we are hoping to have plus or minus 90

7 potential jurors to select on March 2nd.

8       Have you considered how many alternates you want?

9 I'm suggesting two.  Do you think that's enough?

10       **MS. ARGUEDAS:**  (Nods head)

11       **MR. PARRELLA:**  I think that's (Inaudible).

12       **MR. RUBY:**  Okay.

13       **THE COURT:**  Okay.  If there are two, then that means

14 we need 32, you would have ten peremptory challenges, you would

15 have six peremptory challenges, you would each have one

16 peremptory challenge for the alternates.  That would be 18

17 total peremptories.

18       So we figure we need 32 jurors available before you

19 begin exercising peremptory challenges.  So I think 90 is

20 enough to get there.  That's what we are expecting.

21       Which isn't exactly a question, but I'm willing to

22 listen to any response you have to that proposal.

23       **MR. PARRELLA:**  That's fine, Your Honor from the

24 Government.

25       **MR. RUBY:**  Your Honor, we would like to ask the Court

1  to consider a jury questionnaire.  And we have one that we will

2  send to the Government soon.  We can send it today or tomorrow,

3  to get their thoughts on it.

4          **THE COURT:**  Okay.

5          **MR. RUBY:**  Can we agree on a date by which the

6  parties will advise the Court at least as to how we view the

7  idea of a questionnaire?

8          **MR. PARRELLA:**  Your Honor, we also would ask that a

9  questionnaire be implemented.  And just since we're suggesting

10 things here, perhaps jurors could come in on the Friday before,

11 complete the questionnaire, have the results distributed to

12 both sides, no in-court actual questioning going on.

13         And then on Monday, we will avoid the Monday --

14 Monday the 2nd, we'll avoid the -- the issue of jurors trying

15 to get to where they need to be, and fill out the

16 questionnaire, and --

17         **THE COURT:**  Is that consistent with --

18         **MR. RUBY:**  Oh, yeah --

19         **THE COURT:**  Mr. Weir, will that work?

20         **JURY COMMISSIONER WEIR:**  That's very tight, because

21 the summonses are going to go out tomorrow.  So that's less

22 than a three-week turnaround time.

23         **THE COURT:**  Well, or three days later, the following

24 Monday.  It's tight either way, I guess.

25         **JURY COMMISSIONER WEIR:**  Tight either way.

1          **THE COURT:**  I mean, the alternative is that they

2    would come in and do it on Monday, and if you ask nicely then

3    we presumably wouldn't start until Tuesday actually picking it.

4    Either of those things is possible.

5          **MR. PARRELLA:**  We're available either way, so --

6          **MR. RUBY:**  Same thing.

7          **THE COURT:**  Mr. Weir, what would your preference be?

8          **JURY COMMISSIONER WEIR:**  I'm more comfortable with

9    the Monday.  Just the added mail time for the week, and

10   Friday's a bad day for a jury.

11         **THE COURT:**  How about we do that, then?  Just have

12   them come in and what -- in answer to your question of when, if

13   you can get me the -- your joint proposal by next Friday, --

14         **MR. RIORDAN:**  Okay.

15         **THE COURT:**  Because we won't give it to them in

16   advance, we will only give it to them when they get here.  It's

17   not like we will mail it out.  Then we'll tentatively say we'll

18   give it to them on the morning of Monday, March 2nd.

19         And then we'll think about when we start picking the

20   jury, whether it be that afternoon, or the following day, to

21   give you an opportunity to read what they have written.  I'll

22   think about that.

23         **MR. PARRELLA:**  We would actually ask that we would

24   start the next day, if we are going to get them Monday, just

25   have time to go through them.

1    **THE COURT:**  I know you would ask that, and we'll

2  think about the answer to that.  Okay.  Well, I think those are

3  the things we needed to know, right?

4    **JURY COMMISSIONER WEIR:**  (Nods head)

5    **THE COURT:**  Okay.  And, we will talk more about the

6  jury process and the selection process at the pretrial.  But I

7  just wanted to give Mr. Weir some data that he can operate on

8  in terms of how many people he needs to be screening for.

9    So the third thing I wanted to talk to you about was

10  press issues.  There has been an expression of interest from

11  the press about the case.  And, I wanted to tell you some of

12  the things that we've tentatively got in place, and I wanted to

13  get your thoughts on a couple of other things.

14    One is that we can and I plan to make a -- a realtime

15  audio-visual stream of the trial available in the ceremonial

16  courtroom.  It's available during the time frame of our trial.

17    And that will give -- in the event that the courtroom

18  isn't big enough to hold all the people who would like to watch

19  the trial, then that will give them a place to watch it and

20  listen to it.  So, that's one thing.

21    The second thing is, and this is -- this is a

22  tentative decision that we have made -- is that there are 88

23  available seats, roughly, in the courtroom, in this courtroom.

24  There are more in the ceremonial courtroom, but in this

25  courtroom.  So the tentative allocation -- and we're assuming

1  that we will have to, at least at the very beginning of the

2  trial -- it may change over time, but at the beginning, we will

3  have to provide allocated space -- would be 60 seats for the

4  media, 28 seats for the public in this courtroom.  And the

5  other courtroom, it's just going to be first-come,

6  first-served.  And there's much more space in there.

7          Inquiry had been made about the use of laptops and

8  BlackBerrys in the courtroom.  And I'm willing to allow people

9  to use laptops and BlackBerrys in the courtroom, provided that

10 they do not record anything either on cameras or on audio.  If

11 they were to do that, then, then that would be a violation of

12 the rules, and they would either be ejected, or their machines

13 confiscated, or both.  So, it would be a real negative thing.

14 But, in the past that's been allowed, and there's been no

15 problem, so I don't anticipate any problem with that.

16          But there are some issues that I'm considering that I

17 haven't made a decision on, and one relates to the new media

18 room which is about to be opened on the first floor.  Some of

19 the folks here who have been involved in getting that put

20 together have worked really hard on it, and it's something that

21 the Court has worked with the media in devising.  Judge Breyer,

22 who is a dynamo of energy on all fronts, has been a dynamo of

23 energy on the media room.

24          Anyway, it's on the first floor.  It's a way where

25 media with cameras and equipment can come into the building

1  without going through the metal screening.  They can't leave

2  that room, they can't come upstairs because we don't allow

3  cameras in the courtrooms, but they can bring their cameras

4  into this room on the first floor.

5       The idea is that it will be an opportunity, a place

6  if the media wants to interview people and the people want to

7  be interviewed, they may do so in that room.

8       In addition, however, we do have the means to run the

9  audio-visual feed that we will be having in the ceremonial

10 courtroom next door into the media room.  And that's really

11 what I want to discuss with you today, because that would be a

12 way for them to watch the trial down there without having to

13 come through the machines and come up here.

14       There would be a requirement, of course, that nothing

15 be photographed and nothing be taped.  And we would have -- we

16 would have not only, you know, rules in place that media

17 credentials would be withdrawn should anybody try to do that,

18 but we will also have somebody down there watching to make sure

19 it doesn't happen.  So that's one thing I wanted to ask your

20 thoughts on, if there's anybody who has a big issue with that.

21       There's a second question while you're thinking about

22 issues, which is, we have received a request from the press

23 that documents which are admitted into evidence, thereupon but

24 almost immediately be provided in hard copy to representatives

25 of the press, once they're admitted.  That would require some

1  doing on the Court's part, but it could be done, if we agreed

2  to do it.

3           So, those are the two questions I kind of wanted to

4  discuss with you today to get your thoughts on, so --

5           **MR. PARRELLA:**  Your Honor, on the issue of the

6  audio/video presentations, as long as the proper safeguards are

7  taken to make sure that it's not inadvertently broadcast, we

8  have no problem with that.

9           On the document issue, I'd like to think about that a

10 little bit.  That's a bit more unusual.  But as far as the

11 other things go, for the two courtrooms to have them wired up,

12 so long as it's a safe network, we have no problem with that.

13          **THE COURT:**  Yeah.  It's all self-contained.

14          **MR. PARRELLA:**  Uh-huh.

15          **THE COURT:**  As far as I'm aware, all of the things we

16 are proposing are well within the rules that exist at this

17 time.  So, it's really a matter of what we choose to do.

18          **MR. PARRELLA:**  Thank you.

19          **THE COURT:**  Ms. Arguedas?

20          **MS. ARGUEDAS:**  Yes, Your Honor.  We appreciate

21 hearing what the Court is thinking about.  And, we actually

22 need some time to think about it, if that's all right.

23          **THE COURT:**  All right.

24          **MS. ARGUEDAS:**  But we're glad that you're soliciting

25 our comments.  As to the places in the courtroom, were you

1  anticipating -- and we would request -- that some spots be

2  reserved for us, for Mr. Bonds' family and people in our office

3  that are going to be helping us that are not at counsel table.

4          **THE COURT:**  Yes, and we can talk about all those

5  things at -- the immediate thought that I had was that the --

6  the audience, so to speak, and that's the 88 seats we are

7  talking about, are all behind the bar.

8          **MS. ARGUEDAS:**  Okay.

9          **THE COURT:**  In front of the bar, we've got some

10 seats.

11         **MS. ARGUEDAS:**  Right.  But, so --

12         **THE COURT:**  Your office folks, for example, could sit

13 there.

14         **MS. ARGUEDAS:**  Right.

15         **THE COURT:**  We could talk about if there's family

16 members who want to sit there, that can probably be worked out.

17         **MS. ARGUEDAS:**  In front of the bar.

18         **THE COURT:**  In front of the bar.

19         **MS. ARGUEDAS:**  Okay.

20         **THE COURT:**  But that we would need to talk about

21 those things.  But I feel -- I feel much more comfortable since

22 we do have the ceremonial courtroom, and so the public can

23 attend and see and participate there, that if we need to

24 reserve some other seats for family or whatever, I think we can

25 certainly talk about that.

1              **MS. ARGUEDAS:**  Great.  Thank you.

2              **THE COURT:**  Anything else for today?

3              The motions will be submitted, you will hear from me

4    shortly on them.  I do want to emphasize that these are in

5    limine motions, which are awkward in the sense that they are

6    being presented in isolation without the benefit of already

7    having heard any testimony about any of these matters.

8              So, some of the rulings may be conditional in some

9    respects, depending on what the testimony is that actually

10   comes in.

11             **MS. ARGUEDAS:**  Yes, Your Honor.  We have two other

12   matters that we wanted to bring up.

13             **THE COURT:**  Okay.

14             **MS. ARGUEDAS:**  The first one I think is simple, which

15   is that the BALCO court file is still under seal.  And that

16   doesn't seem --

17             **THE COURT:**  Oh, in the BALCO prosecution, you mean.

18             **MS. ARGUEDAS:**  I mean everything that happened in the

19   case that convicted Victor Conte and --

20             **THE COURT:**  Oh, okay.

21             **MS. ARGUEDAS:**  -- and et cetera.  I don't think

22   there's any reason for it, and that should be unsealed.

23             **MR. NEDROW:**  If the Court wants my response now, I'm

24   confused, actually, because actually 98 percent or 99 percent

25   of the file is not under seal.

1          There are a few search warrants that are under other

2   docket numbers that predated the BALCO -- or were part of the

3   BALCO runup that aren't technically part, of course, of the

4   file No. CR04-044, because they were under different numbers.

5   And, --

6          **THE COURT:**  I'll tell you what.  Why don't you talk

7   to each other about this.

8          **MR. NEDROW:**  Sure.

9          **THE COURT:**  It sounds like we're working up to no

10  opposition.  And if you guys all agree to something, I'll sign

11  off on it.

12         **MR. NEDROW:**  Okay.

13         **MS. ARGUEDAS:**  I don't know if we have no opposition.

14  We want 100 percent of it to be unsealed.  And under your

15  ruling on Monday and everything that is in existence on the

16  subject of the First Amendment, there should be nothing sealed

17  in the Court file.

18         **THE COURT:**  Well, the Government didn't want it

19  sealed this time, either.  So I'm saying, talk to Mr. Nedrow.

20  Maybe it's all okay.  And if there's some specific thing he's

21  going to object to, then I need to look and think about that.

22         **MR. NEDROW:**  Okay.

23         **MS. ARGUEDAS:**  Okay, we will do that.

24         Secondly, we learned this morning that the Government

25  filed a motion with this Court last year, in November,

1  regarding the -- they call it the TIGTA --

2          **THE COURT:**  The who?

3          **MS. ARGUEDAS:**  The TIGTA report, which we understand

4  and it's been reported that the that the TIGTA report is

5  something which was an internal Government investigation in

6  which Agent Novitsky and all of the BALCO agents were

7  investigated for money that went missing from the BALCO search.

8  Or the Greg Anderson search, I guess, more specifically.

9          And that it also was an investigation of an

10 allegation by other law enforcement officials that Agent

11 Novitsky was overheard to be talking about being interested in

12 getting a book deal.

13         We learned this morning that this was filed in

14 November, and that it was filed ex parte and under seal.  And

15 we object to that filing, and we ask that everything to do with

16 that filing be disclosed to us right away.

17         And, secondly, we are asking for that TIGTA report.

18 It is our understanding that it is 150 pages long.  It is

19 clearly Brady material.  It apparently establishes that money

20 did go missing from the Anderson search, although it is

21 inconclusive about exactly who made it go missing --

22         Regardless of that, if money went missing from the

23 Anderson search, then that calls into question the credibility

24 and the integrity of the search, which is directly relevant to

25 our case.

1      Secondly, if it is investigating the subject of

2 whether Agent Novitsky said something about being interested in

3 a book deal, it has been reported that he made inconsistent

4 statements on that subject, and that in the TIGTA report, it is

5 reported that he said something like, "Somebody must have

6 misunderstood a joke," and it has been reported that he filed a

7 declaration in your court, in, I think in the BALCO file, in

8 which he says, "I never said anything at all about a book

9 deal." So those are arguably inconsistent statements. And we

10 are entitled to them.

11      So, we're asking now for two things. One is for all

12 the pleadings that were filed in front of you in November on

13 this subject, and secondly, for the report, itself.

14      **THE COURT:** Okay.

15      **MR. FINIGAN:** Your Honor, both Mr. Nedrow and I have

16 responses here. With respect to the filing, itself, this is a

17 filing which was filed November 10th, with Your Honor. It's

18 very similar to the other two similar cases that Your Honor has

19 heard. It was stamped Received, I believe, December 29th. And

20 it's not that we have not wanted to or intended not to turn it

21 over.

22      We've simply been waiting for a ruling similar to the

23 *Thomas* or the *Graham* case, where Your Honor issued an order

24 under the conditions -- putting conditions upon the release of

25 that information. So, that's all that we were awaiting.

1          THE COURT:  And the filing, you say, is

2   November 10th?

3          MR. FINIGAN:  Correct.

4          MS. ARGUEDAS:  Well, Your Honor, I don't know of any

5   reason why they should be allowed to file anything in front of

6   you, on November 10th, asking you to do something, and we

7   shouldn't be served with it.  I --

8          THE COURT:  I know that's your position.  I heard

9   what you said.  Thank you.

10         MR. FINIGAN:  That's all laid out in the filing, Your

11  Honor.  It's exactly the same as it was done in two prior

12  cases.  And as far as the substance of the report, I'll allow

13  Mr. Nedrow to address that.

14         MR. NEDROW:  Yes, if I may, briefly, Your Honor.

15  Thank you.

16         And the Court, I'm sure, is familiar with this item.

17  It's never been a secret.  It's been disclosed to the Court

18  three times, now.

19         It was disclosed in the original BALCO case, before

20  the evidentiary hearing that was to occur.  And the reason it

21  never came to light then was because the BALCO Defendants

22  agreed to plead guilty, and withdrew their motions.  The Court

23  at that time ordered it disclosed to defense, and we disclosed

24  it to defense.

25         It was a non-public thing, it wasn't supposed to

1 become public.  And it appears that somebody gave it to

2 somebody on the Internet or something, and that's why it's out

3 now.

4         The Court also got a summary of these events in the

5 two prior trials, submitted.  As the Court remembers, both the

6 *Thomas* and the *Graham* trial, in both those circumstances, the

7 Court reviewed a summary of what had happened, and ordered it

8 disclosed to the defense, which of course the Government did.

9 Further ordered that it be sealed, and not publicly disclosed.

10 And the counsel and the defense in that case abided by that

11 ruling.

12        And it was further the order of the Court that it

13 would not be used as basis to cross-examine Agent Novitsky,

14 unless the defense were to raise the argument and make a pitch

15 to the Court, and persuade the Court that it should be

16 introduced.

17        And, nobody even raised the argument.  And the reason

18 for that, of course, is that the investigation makes a finding

19 that there's no evidence supporting Agent Novitsky did anything

20 wrong, at all.  So, that's what they're talking about.

21        And now that it's been improperly put out there by

22 somebody in the public, we don't have an objection to turning

23 it over.

24        The only distinction I want to make sure the Court

25 and Counsel are aware of is -- there's two things here.

1  There's a 28-page report, approximately 28 or 30-page report

2  that's a summary.  And then there's a larger document that is

3  sort of the underlying investigation.

4          And, frankly, we would ask that it be the case, even

5  though it's already out there, that it be given to the defense

6  with the understanding that it shouldn't be circulated or put

7  out in the press any more than it has been.

8          We have no problem giving it to the defense.  And, --

9          **THE COURT:**  What's in it now?  Is it the 28 pages or

10  is it the whole thing?

11          **MR. NEDROW:**  The whole thing was in the original

12  BALCO case, and the summary --

13          **THE COURT:**  (Inaudible)

14          **MR. NEDROW:**  In the original BALCO case, correct, we

15  did.

16          **THE COURT:**  No, no, but I mean, you're willing to do

17  so now?

18          **MR. NEDROW:**  Yes.  Yes.

19          **THE COURT:**  All right.  Well, then, I order that you

20  do so.

21          **MR. NEDROW:**  Okay.

22          **THE COURT:**  Now your second question is -- is some

23  kind of protective order?

24          **MR. NEDROW:**  Yes, Your Honor.  I just ask it not be

25  disseminated.  I mean, it was the Court's prior order it be

1  sealed and not disseminated.

2         And of course, I'm not casting aspersions to Counsel

3  here, but somebody gave it to somebody, and that's why it was

4  raised right now.  We filed it ex parte, under seal, with the

5  Court's permission, because it was the kind of thing that

6  shouldn't have been public because they're false allegations,

7  in the -- in the report.

8         **THE COURT:**  Well, does the same logic that has

9  required the unsealing of all these other materials lately

10  suggest that there be no sealing requirement on these matters,

11  either?

12         **MR. PARRELLA:**  Yes, basically, Your Honor.  I was

13  just going to mention that we had prior orders on this in the

14  *Graham* case and the *Thomas*, case and we're actually just asking

15  for the same order here, now.

16         But I guess the horse is out of the barn, so to

17  speak, on the factual underpinnings on the issue.  So, we have

18  no problem with turning it over, but we still are requesting --

19         **THE COURT:**  With respect to the cross examination.

20         **MR. NEDROW:**  Right.

21         **MR. PARRELLA:**  Yes.  We're still requesting that

22  order.

23         **THE COURT:**  All right.  Well, then, turn it all over

24  to Ms. Arguedas today.

25         **MR. NEDROW:**  Okay.

1              MS. ARGUEDAS:  Can I just clarify, "all" means the

2  150-page report?

3              MR. NEDROW:  Yeah.

4              THE COURT:  And the executive summary, if that's what

5  that was.

6              MR. NEDROW:  Your Honor, and if I may be said today,

7  you know, that this thing has been around for a while, just to

8  make sure, that it might be a day or so to get our hands on the

9  whole thing.

10             If I can have until tomorrow -- we'll turn it over as

11  soon as we can.

12             THE COURT:  By the close of business tomorrow?

13             MR. NEDROW:  Yes, thank you, Your Honor.

14             MS. ARGUEDAS:  Your Honor, I have another question on

15  the subject.  The Government just now said Agent Novitsky was

16  exonerated.  And my understanding is that what the report

17  concluded was solvability factors are not present.  And so,

18  they decided they couldn't go reach a conclusion.  That's

19  different.

20             So, I'm asking, because I think it puts us in a very

21  different posture, whether or not he spoke authoritatively or

22  not.

23             MR. NEDROW:  I didn't -- difference of an opinion.  I

24  would agree --

25             MS. ARGUEDAS:  Solvability that --

1          **MR. NEDROW:**  Excuse me.  I don't agree with Counsel's

2    characterization.  I think it exonerates him, but if Counsel

3    wants to look at whatever it's written in the report, and have

4    a different view, that's fine.

5          **MS. ARGUEDAS:**  Well, I don't have access to it.  But

6    I don't think that he should be allowed to say on the Record

7    something like "Somebody was exonerated if this report is

8    correct, and then what it says is solvability factors are not

9    present.  And no conclusion was reached.  I don't think he

10   should be allowed to say that on the Record.

11         Unfortunately, I don't have the report yet, but the

12   report that I'm reading has been accurate in all respects.  So

13   I'm thinking that when they say, in quotes, "Solvability

14   factors are not present," that that's probably true, and that's

15   not an exoneration.

16         **MR. NEDROW:**  Well, that report --

17         **THE COURT:**  We're now right back into hearsay.  What

18   you say about that report doesn't matter; what he says about

19   that report doesn't matter.  What it says matters.

20         **MS. ARGUEDAS:**  Right.

21         **THE COURT:**  And you'll be able to read it tomorrow.

22   So --

23         **MS. ARGUEDAS:**  Thank you.

24         **MR. NEDROW:**  Thank you, Your Honor.

25         **THE COURT:**  Thank you.  Anything else for right now?

1        **MR. PARRELLA:**  Not from the Government.

2        **THE COURT:**  Okay, thank you.

3        **MR. NEDROW:**  Thank you, Your Honor.

4        (Proceedings concluded at 11:50 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR 07-0732 SI, United States v. Barry Lamar Bonds, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/S/ Belle Ball_____

Belle Ball, CSR 8785, CRR, RMR

Monday, February 23, 2009